WILLIAM G. CAMPBELL AND NORMA T. CAMPBELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Campbell v. Commissioner
Docket No. 22367-83
United States Tax Court
T.C. Memo 1990-162; 1990 Tax Ct. Memo LEXIS 144; 59 T.C.M. (CCH) 236; T.C.M. (RIA) 90162; March 27, 1990
Lewis H. Mathis, James M. Saxton, and B. Gray Gibbs, for the petitioners. Matthew A. Lykken, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income tax for the calendar years 1979 and 1980 in the amounts of $ 186,670 and $ 295,318, respectively. In an amendment to answer, respondent *147 alleged that petitioners were liable for additions to tax under section 6653(a) in the amounts of $ 9,333.50 and $ 14,765.90 for the years 1979 and 1980, respectively, and made claim for these amounts. [1]
Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision: (1) whether the value of interests in certain partnerships received by William G. Campbell in 1979 and 1980 for services performed has an ascertainable value the amount of which is includable in petitioners' income, and if so, what that value is, and (2) whether petitioners were negligent in failing to include the value, if any, of the partnership interests received in their gross income or in claiming deductions to which they were not entitled. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Little Rock, Arkansas at the time they filed their petition in this case, filed joint Federal *148 income tax returns for the calendar years 1979 and 1980 based on the cash method of accounting. The 1980 return was timely filed pursuant to extensions granted. During 1979 and 1980, and for some years prior thereto, William G. Campbell (petitioner or Mr. Campbell) was employed by the Summa T. Group, a collection of affiliated entities which were primarily engaged in the formation and syndication of limited partnerships. Mr. Campbell performed most of his services for, and received compensation from, Summa T. Realty, Inc. (Summa T. Realty), a real estate brokerage and consulting firm which was a member of the Summa T. Group. Mr. Campbell served as vice president and director of most members of the Summa T. Group, including Diversified Financial Services Corporation of America (Diversified Financial Services), Summa T. Realty, Summit Mortgage Company, Summa T. Corporation, and Summa Management Company. Mr. Campbell also served as vice president of Realty Properties Company (Realty Properties), a corporation organized under the laws of the State of Delaware which was also a member of the Summa T. Group. A man named David R. Kane served as the president of Realty Properties. Summa *149 T. Realty and Realty Properties were subsidiaries of a common parent, Summa T. International. Prior to 1979, Mr. Campbell, in partnership with a man named Jim Nettles (Mr. Nettles), packaged and sold interests in "transactions" to prospective investors on behalf of Mr. Campbell's employer, Summa T. Realty. If Mr. Nettles, who was primarily responsible for selling the interests, was unable to sell all of the interests in a particular transaction, other salesmen who worked for Mr. Campbell's employer would sell the remainder. The arrangement between Mr. Campbell and Mr. Nettles concluded in early 1979 after Mr. Nettles terminated his employment arrangement with Summa T. Realty. After Mr. Nettles left, Mr. Campbell's responsibilities and duties changed. He became predominately responsible for locating suitable properties for Summa T. Realty, negotiating the acquisition of those properties, obtaining the financing necessary to acquire the properties, organizing the partnerships which would eventually acquire those properties, and assisting in the preparation of offering materials in connection with the syndication of those partnerships. Mr. Campbell also helped promote the sale *150 of partnership interests to prospective investors. After Mr. Nettles' departure, Mr. Campbell negotiated a new compensation arrangement with his employer. Under the new arrangement, he was to receive 15 percent of the proceeds from each limited partnership syndication. In addition, for his services, Mr. Campbell was to obtain a "special limited partnership interest" in partnerships which he helped form and finance. Mr. Campbell consulted with Mr. Donald Turlington, a tax attorney, about the tax consequences of his receipt of the special limited partnership interests in exchange for services. Mr. Turlington was an associate with a New York law firm and taught partnership tax law at New York University. Mr. Turlington told Mr. Campbell that there was little or no chance that he would be taxed on the receipt of such interests but would, instead, be taxed as he received distributable shares of income and gains from the partnerships. Mr. Campbell also consulted with Mr. George Hardin, a tax attorney, about the tax consequences to petitioners of Mr. Campbell's receipt of special limited partnership interests. Both Mr. Hardin and Mr. Campbell were aware of the case of Diamond v. Commissioner, 56 T.C. 530 (1971), *151 affd. 492 F.2d 286 (7th Cir. 1974), in which this Court held that a similar interest was taxable upon receipt. However, Mr. Hardin advised Mr. Campbell that the facts of Diamond v. Commissioner, supra, were distinguishable and that the value of the interests Mr. Campbell received need not be included in income. Although the interests provided immediate tax benefits to petitioners, Mr. Campbell was also enthusiastic about the residual value these interests might have. Pursuant to this new compensation arrangement, Mr. Campbell received, in 1979, a 2-percent special limited partnership interest in Phillips House Associates, Ltd. (Phillips House or the partnership) in exchange for services he had rendered in the formation and syndication of the partnership. In 1980, petitioner received a 1-percent special limited partnership interest in The Grand, Ltd. (The Grand) and a 1-percent special limited partnership interest in Airport 1980, Ltd. (Airport) in exchange for services he had rendered in the formation and syndication of those partnerships. Realty Properties was the sole general partner of Phillips House, The Grand, and Airport. Mr. Kane also became a special *152 limited partner in these three partnerships. Phillips House
Phillips House was organized in October 1979 under the laws of the State of Missouri for the purpose of acquiring, restoring, and operating a 20-story hotel in downtown Kansas City, Missouri (the Hotel) with a view toward obtaining certain tax benefits, distributing cash to potential investors at a rate of 10 percent of their net cash investments, and realizing a gain upon the eventual sale or refinancing of the Hotel. The Hotel was to be acquired from a group of sellers unrelated to the Summa T. Group. The total purchase price of the hotel was $ 1,600,000. The total cost of restoring and furnishing the Hotel was projected to be $ 6,675,000. Permanent financing for acquisition and restoration of the Hotel was to be obtained by the Land Clearance For Redevelopment Authority of Kansas City, Missouri (the Authority) primarily through the issuance of $ 8 million in tax-exempt revenue bonds. "Bond closing" was to take place on or before January 29, 1980, by which time it was expected that the Authority would have obtained permanent financing by the issuance of its tax-exempt revenue bonds. The Authority could not *153 obtain permanent bond financing by January 29, 1980. However, the Authority subsequently resolved to obtain permanent financing through the issuance of a secured nonrecourse promissory note and units of participation rather than through the issuance of bonds. On March 1, 1980, the Authority executed a $ 1,136,000 nonrecourse promissory note in favor of the sellers. The Authority obtained permanent financing in April 1980 when Parham and Company, Inc. agreed to underwrite the sale of $ 8 million in units of participation. The Hotel was renovated and opened for business in May 1981. Upon its organization in October 1979, the sole general partner of Phillips House was Realty Properties. The sole limited partner was Mr. Campbell. Mr. Campbell was required to contribute $ 100 to the capital of Phillips House in return for his limited partnership interest and was not required to make any further contributions. According to the original certificate of limited partnership, Mr. Campbell, as sole limited partner, was to receive 95 percent of the profits and losses of Phillips House. According to the original limited partnership certificate, no limited partner could sell or assign *154 any part of his interest without the consent of the general partner. The general partner was authorized to admit, in its sole discretion, additional limited partners. Pursuant to this authorization, 35 Class A limited partnership units in Phillips House were offered for sale to "suitable" investors through a nonpublic offering memorandum. The minimum recommended investment was one Class A limited partnership unit and the purchase price for each Class A limited partnership unit was $ 99,250. Diversified Financial Services was the sales agent for the offering and was to receive a placement commission of up to 8 percent of investor subscriptions to be paid out of the general partner's separate funds. In addition, the partnership was to pay Diversified Financial Services a nonaccountable expense allowance of 3 percent of the offering proceeds as reimbursement for its direct expenses and overhead expenses it incurred as a result of the offering. The maximum amount Diversified Financial Services could receive as an expense allowance was $ 104,213 (35 partnership units multiplied by $ 99,250 multiplied by 3 percent). Mr. Campbell and Mr. Kane were denominated as "special limited partners" *155 in the Phillips House offering memorandum. According to the offering memorandum, total capitalization of Phillips House was projected to be $ 3,504,050, assuming all Class A limited partnership units offered for sale were actually sold. Of this amount, the Class A limited partners were to contribute a total of $ 3,473,750, the special limited partners were to contribute a total of $ 300, and the general partner was to contribute $ 30,000. Approximately 41.5 percent of the proceeds of the offering were to be set aside as a bond debt service reserve fund and to make principal payments on the second mortgage note, while another 16 percent of the proceeds were set aside for working capital and professional services (i.e., legal and tax advice). The remaining 42.5 percent of the proceeds were to be paid, in the form of expense allowances, consulting fees, and management fees, to the general partner, Realty Properties, and other members of the Summa T. Group. According to the Phillips House offering memorandum, 94 percent of the profits and losses of the partnership were to be allocated to the Class A limited partners, 2 percent of the profits and losses were to be allocated to the *156 general partner, and 2 percent of the profits and losses were to be allocated to each of the special limited partners. Any cash available from the operations of Phillips House was to be allocated first to the Class A limited partners to the extent of 10 percent of their capital contributions per year. This "priority return" was subject to a special allocation to Realty Properties of all operating receipts of Phillips House prior to January 1, 1981. However, the general partner was obligated to advance up to $ 100,000 in working capital, which would be repaid without interest, if the partnership's cash flow was insufficient to cover its operating expenses and debt service payments. After January 1, 1981, any cash available from operations would be allocated first to satisfy the Class A limited partners' priority return and second to pay each of the special limited partners $ 7,391 per year as a "special priority return." If any cash from operations was available after satisfaction of both the priority return and special priority return, the general partner would be paid $ 7,391 per year. Any cash available after satisfaction of the priority return, the special priority return, *157 and the general partner's return was to be distributed to all of the partners in accordance with their ratio for sharing profits and losses. According to projections contained in the offering memorandum, Phillips House was expected to show a loss for Federal income tax purposes in each of the years 1979 through 1985. For example, in 1979, the partnership projected an overall loss of $ 1,937,000. Each Class A limited partner's share of the partnership's overall loss in 1979 was projected to be $ 52,022 resulting in a tax benefit of approximately $ 26,011 (assuming each Class A limited partner purchased a single Class A limited partnership unit and was taxed at a combined Federal/state rate of 50 percent). According to the figures contained in the offering memorandum, the remaining partners (i.e., Mr. Campbell, Mr. Kane, and Realty Properties) could expect to receive approximately $ 38,740 in tax losses from Phillips House in 1979. A good deal of the 1979 loss was attributable to the partnership's expected deduction of the substantial fees payable to Realty Properties and its affiliates. The partnership also intended to donate a perpetual easement on the exterior portion or facade *158 of the Hotel to the Historic Kansas City Foundation. The easement was expected to reduce the value of the Hotel by approximately $ 1,200,000 and, thus, the projection was stated to reflect a charitable deduction in the amount of $ 1,200,000. Each Class A limited partner's distributive share of the charitable deduction was projected to be $ 32,229. The distributive share of such deduction would be $ 24,000 each for the three remaining partners. The partnership's overall loss for 1980 was projected to be $ 1,150,000 and each Class A limited partner's distributive share of such loss was projected to be $ 30,886. Each Class A limited partner's projected tax benefit was expected to be $ 29,075. This amount includes investment tax credits totaling $ 13,632 per Class A limited partner attributable, in part, to rehabilitation costs which the partnership would assert were entitled to investment tax credit treatment. According to the figures contained in the offering memorandum, in 1980 the remaining partners could expect to receive a tax loss of approximately $ 23,000 each, as well as investment tax credits in the approximate amount of $ 10,151. Over the next four years (1982 through *159 1985), the overall projected loss of the partnership and, therefore, the tax benefits available gradually decreased until 1986 when the partnership expected to pass through taxable income to the Class A limited partners for the first time. During 1986 and for the next three years thereafter, the partnership was expected to pass through a total of $ 35,076 in taxable income to each Class A limited partner. The offering memorandum warned that the partnership intended to take positions with respect to certain deductions and allocations that were not based on settled interpretations of tax law and that, if the Internal Revenue Service were to audit the returns of the partnership and its Class A limited partners, some or all of the deductions and allocations would probably be disallowed. Nevertheless, the offering memorandum projected that each Class A limited partner would receive a total of $ 172,261 in tax losses from his investment in Phillips House and save approximately $ 82,225 in Federal income taxes (assuming his income from other sources was taxed at a rate of at least 50 percent) over the 11 taxable years for which projections were available (1979 through 1989). The Class *160 A limited partners could also expect tax savings from utilizing the $ 13,632 in investment tax credits passed through from Phillips House in 1980. According to the figures contained in the offering memorandum, from 1979 through 1989, the remaining partners (i.e., Mr. Campbell, Mr. Kane, and Realty Properties) could each expect to receive tax losses totaling $ 128,280, taxable income totaling $ 26,120, and investment tax credits totaling approximately $ 10,151. Mr. Campbell and Mr. Kane were each allocated a basis in the partnership based on the amount of nonrecourse indebtedness of the partnership. The projections also reveal that, after 1979, the partnership did not anticipate a positive cash flow again until 1982 and did not expect to have cash available for distribution to the Class A limited partners until that year. It did not expect to have cash available for distribution to the special limited partners and the general partner until 1984. In 1984, the partnership expected to have $ 358,000 in cash available for distribution to the Class A limited partners and $ 23,000 in cash available for distribution amongst the special limited partners and the general partner. In 1985, *161 the partnership expected to have $ 459,000 in cash available for distribution to the Class A limited partners and $ 29,000 in cash available for distribution amongst the special limited partners and the general partner. From 1986 through 1989 (the last year for which projections were made), the partnership expected in each year to have approximately $ 460,000 in cash available for distribution to the Class A limited partners and $ 29,000 in cash available for distribution amongst the special limited partners and the general partner. According to the offering memorandum, the Class A limited partners could expect total cash distributions in the amount of $ 91,372 over the ten years for which projections were available. In addition to a share in the profits and losses of Phillips House, both the general partner, Realty Properties, and the special limited partners, Mr. Campbell and Mr. Kane, were entitled to share in any proceeds which might become available from the sale or refinancing of the Hotel. The net proceeds from the sale or refinancing of the Hotel were to be distributed first to the Class A limited partners in accordance with their respective "capital investments" plus any *162 accrued deficiency in the priority return for the year of sale or refinancing. Next, the general partner would be entitled to a return of his $ 30,000 capital contribution. Thereafter, 5 percent of the net proceeds were to be distributed first to each of the special limited partners to the extent available and then 5 percent to the general partner. Finally, any remaining proceeds were to be distributed in a ratio of 85 percent to the Class A limited partners, 5 percent each to the special limited partners, and 5 percent to the general partner. According to the offering memorandum, the partnership units were intended to be long-term investments only. The sale of the partnership units was not being registered under state or Federal securities laws nor did the limited partners have any right to require such registration. The offering memorandum provided that the sale or exchange of a unit in the partnership would not be permitted without the consent of the general partner. According to the offering memorandum and sample certificate of limited partnership attached thereto, the general partner could arbitrarily withhold its consent to such a transfer. The offering memorandum also *163 noted that the resale value of the units would probably decline due to the ultimate exhaustion of the tax benefits which would be available in earlier years. The general partner was solely responsible for the management of the affairs of the partnership and was not required to obtain the consent of the limited partners except under certain specifically enumerated circumstances. For example, the general partner was empowered to borrow money on behalf of the partnership or lend money to the partnership without the consent of the limited partners. However, in order to sell, dispose of, mortgage, lease, demolish, or substantially alter the Hotel, the general partner was required to obtain the consent of a majority in interest of the Class A limited partners. The special limited partners did not have to be consulted. The day-to-day management of the Hotel itself was delegated to Sunn Management, Inc. (Sunn), a professional hotel and management company. By December 31, 1979, 20 Class A limited partnership units in Phillips House had been sold and 15 remained outstanding. By the time an amended certificate of limited partnership for Phillips House was filed on May 28, 1980, 30.5 Class *164 A limited partnership units had been sold. By December 31, 1980, all 35 Phillips House Class A limited partnership units had been sold. A second amended certificate of limited partnership, dated April 29, 1981, listed the names and addresses of all participants in Phillips House, including Realty Properties, Mr. Campbell, and Mr. Kane. Phillips House filed a Form 1065, "U.S. Partnership Return of Income" for its tax year ending December 31, 1979 (the 1979 partnership return), on which it reported an ordinary loss in the amount of $ 5,049 attributable to travel, printing, postage, bank charges, amortization of organizational expenditures under section 709, and miscellaneous expenses. The partnership's return was prepared by the accounting firm of Baird, Kurtz and Dobson and executed by the general partner on April 15, 1980. As noted, the partnership was obligated to pay Diversified Financial Services 3 percent of the offering proceeds as a nonaccountable expense allowance (up to a maximum of $ 104,213 if it sold all 35 of the Class A partnership units). In computing its amortization deduction under section 709, the partnership included the full $ 104,213 in organizational expenses *165 even though only 20 partnership units had been sold by the end of 1979. In addition, the partnership reported a charitable contribution in the amount of $ 1,200,000. The partnership attached to the partnership return a Schedule K-1, "Partner's Share of Income, Credits, Deductions, etc. -- 1979" (the 1979 Phillips House K-1), for each Class A limited partner, both special limited partners, and the general partner. The 1979 Phillips House K-1 for Mr. Campbell indicated that, on December 28, 1979, he acquired a 2-percent interest in the profits and losses of the partnership and a .01-percent interest in the capital of the partnership. The 1979 Phillips House K-1 also indicated that Mr. Campbell's share of the partnership's nonrecourse debt was $ 31,680, that his share of the partnership's ordinary loss was $ 102, and that his share of the partnership's charitable contribution was $ 24,000. Finally, the 1979 Phillips House K-1 indicated that, as of December 31, 1979, Mr. Campbell's capital account had a negative balance of $ 23,952. On its partnership return for the tax year ending December 31, 1980 (the 1980 partnership return), Phillips House reported an ordinary loss in the amount *166 of $ 1,818,678. A 1980 Schedule K-1 (1980 Phillips House K-1) for Mr. Campbell, which had been attached thereto, indicated that, as of December 31, 1980, Mr. Campbell owned a 2-percent interest in the profits and losses of Phillips House and in addition, owned a 2-percent interest in the capital of Phillips House. According to the 1980 Phillips House K-1, Mr. Campbell's share of the partnership's nonrecourse debt was $ 182,760 and his distributive share of the partnership's ordinary loss was $ 36,374. The 1980 Phillips House K-1 also indicated that, as of December 31, 1980, Mr. Campbell's capital account had a negative balance of $ 60,326. The Grand
The Grand was organized under the laws of South Carolina in November 1980 for the purpose of acquiring, improving, and operating a Howard Johnson's Motor Lodge (the Motel) which was located in Myrtle Beach, South Carolina with a view toward obtaining certain tax benefits. The Grand was to acquire the Motel, which was already in operation, from Summit Mortgage Company, a member of the Summa T. Group, for approximately $ 11,125,000. Approximately $ 350,000 of the total purchase price of the Motel was allocated by The Grand to *167 a "covenant-not-to-compete," under which Summit Mortgage Company and certain of its affiliates agreed not to acquire, for a period of six months from the date of closing, any ownership interest in any venture which was within a five-mile radius of the Motel and which would compete directly with the Motel. Approximately $ 547,347 of the total purchase price was due at closing while a payment of $ 312,500 was due on January 21, 1982, and again on January 21, 1983. In addition, The Grand was required to assume liability for repayment of two preexisting notes which had a combined principal balance of approximately $ 602,500. Finally, The Grand was to issue a nonrecourse "Wrap Note and Mortgage" for the balance of the purchase price, $ 9,347,500, and precomputed capitalized interest in the amount of $ 28,716,750. [2] Interest was computed at a rate of 9.99 percent, utilizing the "Rule of 78's." The wrap note was executed on November 2, 1980, by Mr. Campbell on behalf of the general partner, Realty Properties, and by Mr. Kane on behalf of Summit Mortgage Company. *168 Summit Mortgage Company had purchased all of the stock of a corporation which owned the Motel in July 1980 for approximately $ 10,448,509 and planned to liquidate such corporation so that it could convey direct title to the Motel to The Grand in December 1980. By virtue of the transaction Summit Mortgage Company would also become liable for approximately $ 350,000 in Federal income taxes it would incur upon liquidation of the corporation. Summit Mortgage Company secured a profit of approximately $ 326,614 upon completion of the transaction ($ 11,125,000, including $ 350,000 for the covenant not to compete, reduced by $ 10,448,509, the purchase price of the corporation's stock, and further reduced by $ 350,000, the Federal income taxes due upon liquidation). According to the original certificate of limited partnership, which had been filed on October 24, 1980, upon formation of The Grand, the sole general partner was Realty Properties and the sole limited partner was Mr. Campbell. Mr. Campbell, as sole limited partner, was to be allocated 97 percent of the profits of The Grand. Mr. Campbell was required to contribute $ 150 in cash to The Grand in exchange for his interest. Mr. *169 Campbell was not required to make any further capital contributions. According to the certificate of limited partnership, no limited partner (including Mr. Campbell) had the right to assign his interest except under specified conditions, one such condition being the agreement of the general partner, Realty Properties, to the assignment. The general partner was given the right, in its sole discretion, to admit additional limited partners. Pursuant to this authorization, 35 Class A limited partnership units in The Grand were offered for sale to investors through a nonpublic offering memorandum. The purchase price of each partnership unit was $ 99,750 and the minimum recommended investment was one unit. Diversified Financial Services was the sales agent for the Class A limited partnership units and was to receive a placement commission of up to 8 percent of Class A limited partnership subscriptions plus a nonaccountable expense allowance equal to 3 percent of the proceeds from the sale of the units (up to a maximum of $ 104,738 if all 35 units were sold). Mr. Campbell and Mr. Kane were denominated as "special limited partners" in The Grand offering memorandum. Total capitalization *170 of The Grand was projected to be $ 3,521,250, of which $ 3,491,250 was expected to be raised through sale of Class A limited partnership units in The Grand, $ 50,000 was to be contributed by Realty Properties, and $ 150 was to be contributed by each special limited partner. According to the offering memorandum, 62 percent of the capital contributed was to be used for equity payments, prepaid debt service, loan assumption payments, and project improvements. Approximately 2.1 percent of the contributed capital was to be used to pay legal and accounting fees, while 5.7 percent of the contributed capital would serve as the working capital for The Grand. The remaining 30.2 percent of contributed capital would be paid, in the form of expense allowances, consulting fees, management fees, and financing fees, to Realty Properties and its affiliates, Summa T. Realty and Diversified Financial Services. Realty Properties was to receive a fee of $ 209,475 for providing a system of cost controls and market survey for The Grand. In addition, Realty Properties was to develop a marketing plan for The Grand which would focus on the sale of golf and tennis packages during the Motel's slow months. *171 Realty Properties was also entitled to a management fee equal to 1/24th of 1 percent of the total value of The Grand's assets. Summa T. Realty was to receive a total of $ 900,025 in consulting fees from The Grand, including a fee of $ 687,275 for financial and tax consulting services which were to be rendered over the first 37 months of the Motel's operation. The tax consulting services related mostly to the design, organization, and coordination of the offering so as to provide significant tax benefits. Mr. Campbell participated in the provision of these tax services but was primarily involved in the provision of financial services (i.e., the selection and acquisition of properties). According to the offering memorandum, 97 percent of the profits and losses of The Grand were to be allocated to the Class A limited partners, 1 percent of the profits and losses were to be allocated to Realty Properties, and 1 percent of the profits and losses were to be allocated to each of the special limited partners, Mr. Campbell and Mr. Kane. Any cash available from the operations of The Grand was to be used first to pay all sums due on partnership obligations, second to establish reasonable *172 reserves, and third to make distributions to the partners. Any cash available for distribution was to be paid first to the Class A limited partners to the extent of 10 percent of their capital contributions per year (the priority return). Any cash available after payment of the priority return was to be used to pay the special limited and general partners a return of $ 3,599 each per year. Thereafter, any remaining cash was to be allocated and distributed in accordance with the partners' ratio for sharing profits and losses. According to projections contained within the offering memorandum, The Grand was expected to incur a taxable loss in each of the years 1980 through 1989. For example, in the taxable year ending December 31, 1980, The Grand was expected to incur a taxable loss in the amount of $ 1,173,072. This loss was, in large part, attributable to the deduction of consulting and management fees and amortization of the covenant not to compete. In addition, the projection reflects large deductions for interest expense and depreciation. Each Class A limited partner's distributive share of The Grand's 1980 loss was projected to be $ 32,511 with a resulting tax benefit (assuming *173 his income from other sources was taxed at a rate of at least 50 percent) of $ 16,255. Each Class A limited partner would also be entitled to claim an investment tax credit in the amount of $ 494. According to the figures contained in the offering memorandum, each of the remaining partners' (i.e., Mr. Campbell, Mr. Kane, and Realty Properties) distributive share of The Grand's 1980 loss would be approximately $ 11,737 and their distributive share of investment tax credit would be $ 178 each. The offering memorandum for The Grand warned, as did the offering memorandum for Phillips House, that the partnership's positions with respect to certain deductions and credits were not based on settled interpretations of the tax laws and that the Internal Revenue Service might disallow any of the various deductions and credits claimed. Nevertheless, the offering memorandum projected that each Class A limited partner would receive $ 246,259 in tax losses from his investment in The Grand and save approximately $ 123,128 in Federal income taxes (assuming his income from other sources was taxed at a rate of at least 50 percent) over the 10 taxable years for which projections were available (1980 *174 through 1989). The Class A limited partners could also expect tax savings from utilizing $ 989 in investment tax credits passed through from The Grand. According to the figures contained in the offering memorandum, the remaining partners (i.e., Mr. Campbell, Mr. Kane, and Realty Properties) could each expect to receive tax losses totaling $ 88,902 and investment tax credits totaling $ 357. According to the offering memorandum, The Grand did not project a positive cash flow from operations until 1982. The general partner was obligated to advance up to $ 100,000 in working capital, which would be repaid without interest, if the partnership's cash flow was insufficient to cover its operating expenses and debt service payments. The Grand anticipated sufficient cash flow in 1982 to distribute to each Class A limited partner $ 1,322. The Grand projected cash distributions to the Class A limited partners in the amounts of $ 4,130, $ 6,527, and $ 8,295, in 1983, 1984, and 1985, respectively. However, it was not until 1986 that The Grand expected to have sufficient cash flow to enable it to make cash distributions to the general and special limited partners. In 1986, and each year thereafter *175 for which projections were made, The Grand was expected to have sufficient cash flow to enable it to distribute $ 12,312 per year to each Class A limited partner, $ 4,443 per year to each special limited partner, and $ 4,443 per year to the general partner. In addition to a share in the profits and losses of The Grand, the special limited partners and the general partner were entitled to share in any proceeds which might become available from the sale or refinancing of the Motel. The net proceeds from a sale or refinancing of the Motel were to be used first to pay all sums due on partnership obligations and second to establish reasonable reserves for the partnership. Any proceeds in excess of such amounts were to be used first to repay each Class A limited partner the greater of his original capital contribution (less any amounts previously distributed as a return of capital) or 80 percent of the net proceeds from the sale or refinancing. In addition, the general partner was to be repaid its original capital contribution of $ 50,000 (less any amounts previously distributed as a return of capital). After return of the original capital contributions, 10 percent of the net proceeds *176 from a sale or refinancing was to be paid to each of the special limited partners before any further amounts could be paid to the Class A limited partners or the general partner. Thereafter, 10 percent of the net proceeds (less the amount paid as a return of capital) was to be paid to the general partner. Finally, any remaining proceeds were to be distributed in a ratio of 80 percent to the Class A limited partners, 5 percent to each of the special limited partners, and 10 percent to the general partner. Primary responsibility for management of The Grand partnership was vested with the general partner, Realty Properties. The day-to-day management of the Motel itself was delegated to Summa-Sunn Strand, a joint venture between Summa Management Company, a member of the Summa T. Group, and Sunn Management Company. Summa-Sunn Strand was to receive a management fee equal to 4.25 percent of the gross revenues of the Motel in return for its management services. The offering memorandum and the certificate of limited partnership provided that no limited partner could transfer his interest in The Grand without the consent of the general partner and that the general partner could arbitrarily *177 withhold such consent. The sale of the units was not being registered under Federal or state securities laws and, according to the offering memorandum, the limited partners had no rights to require such registration. The offering memorandum warned that no market existed or would develop for resale of the units. By December 31, 1980, 18.5 Class A limited partnership units in The Grand had been sold and 16.5 units remained outstanding. By December 31, 1981, all 35 Class A limited partnership units in The Grand had been sold. An amended certificate of limited partnership, which listed the names and addresses of all participants in The Grand (including Mr. Campbell), was executed on June 15, 1981. The Grand filed a Form 1065, "U.S. Partnership Return of Income" for its tax year ending December 31, 1980 (the 1980 return) on which it reported an ordinary loss in the amount of $ 811,582. The return was prepared by the accounting firm of Baird, Kurtz and Dobson and bears the date April 11, 1981. On its 1980 return, The Grand allocated a basis of $ 8,287,153 to the buildings and components thereof (i.e., the Motel) that it had purchased and calculated a deduction for depreciation *178 based on this amount. The Grand allocated a basis of $ 285,400 to nondepreciable real property (i.e., the land on which the Motel stood). On April 20, 1981, Appraisal Consultants, Inc., an independent appraisal firm, submitted a report to The Grand valuing the Motel and the land on which it stood at $ 12,200,000 as of April 1, 1981. The firm allocated $ 1,500,000 of the total estimated value to nondepreciable real estate and $ 10,700,000 of the total estimated value to the Motel, its components, and accompanying personalty. The Grand also reported a basis in amortizable intangible assets (including the covenant not to compete) of $ 357,793 and calculated a deduction for amortization based on this amount. The Grand attached a Schedule K-1, "Partner's Share of Income, Credits, Deductions, etc. -- 1980" for each Class A limited partner, each special limited partner, and the general partner. The Schedule K-1 issued to Mr. Campbell (1980 The Grand K-1) indicated that, on November 2, 1980, Mr. Campbell received a 1-percent interest in the profits, losses, and capital of The Grand. According to Mr. Campbell's K-1 from The Grand for 1980, his share of The Grand's nonrecourse debt was *179 $ 99,522 and his distributive share of The Grand's 1980 ordinary losses was $ 8,115. In addition, Mr. Campbell's K-1 from The Grand for 1980 indicates that The Grand passed through a loss of $ 55 as a separately accounted-for item. Finally, Mr. Campbell's K-1 from The Grand for 1980 indicates that, as of December 31, 1980, his capital account in The Grand had a negative balance of $ 8,020. Airport
Airport was formed under the laws of the State of Missouri in July 1980 for the purpose of acquiring, improving, and operating the Northwest Airport Inn (the Inn) which was located in St. Louis County, Missouri with a view toward obtaining certain tax benefits. Airport was to acquire the Inn, on or before October 20, 1980, from S.T. Properties Corporation (S.T.), an affiliate of Realty Properties, for approximately $ 6,250,000. In addition, Airport agreed to pay S.T. $ 250,000 in return for a covenant by S.T. and certain of its affiliates not to compete within a five-mile radius of the Inn for a period of 12 months. S.T. had contracted to acquire the Inn from an unrelated seller in July 1980 for a total purchase price of $ 5,500,000 and, thus, stood to earn a profit of approximately *180 $ 1,000,000 (including the $ 250,000 paid for the covenant not to compete) upon completion of the transaction. Of the total purchase price of $ 6,500,000, $ 400,000 was due in cash upon closing and $ 400,000 was due on March 15, 1981. In addition, Airport issued a "Wrap-around Purchase Mortgage Note" (the wrap note) to S.T. for the balance of the purchase price, $ 5,700,000. The wrap note bore interest at a rate of 9.01 percent, payable monthly and computed under the "Rule of 78's." The sole general partner of Airport was Realty Properties. Mr. Campbell and Mr. Kane were the sole special limited partners of Airport. Mr. Campbell was required to contribute $ 150 in cash to Airport in exchange for his interest therein. Mr. Campbell was not required to make any further capital contributions. According to an amended certificate of limited partnership, which was filed on September 24, 1981, no limited partner (including Mr. Campbell) had the right to assign his interest except under specified conditions, one such condition being the agreement of the general partner, Realty Properties, to the assignment. The general partner was given the right, in its sole discretion, to admit *181 additional limited partners. Pursuant to this authorization, 35 Class A limited partnership units in Airport were offered for sale to investors through a nonpublic offering memorandum. The purchase price of each Class A limited partnership unit was $ 57,500 and the minimum recommended investment was one unit. Diversified Financial Services was, once again, the sales agent for the offering and was to receive a placement commission of up to 8 percent of Class A limited partner subscriptions plus a nonaccountable expense allowance equal to 3 percent of the proceeds from the sale of the units up to a maximum of $ 60,375 if all 35 units were sold. Total capitalization of Airport was projected to be $ 2,032,800 of which $ 2,012,500 was to be raised through sale of Class A limited partnership units, $ 20,000 was to be contributed by Realty Properties, and $ 150 was to be contributed by each special limited partner. The offering memorandum described the projected use of these capital contributions. According to the memorandum, approximately 39.3 percent (or $ 800,000) of contributed capital was to be paid to S.T. as an equity payment. Another 12.3 percent of contributed capital ($ 250,000) *182 was to be used for improvements to the Inn. Approximately 7.5 percent of the proceeds of the offering would be used as working capital and 2.4 percent would go towards legal and accounting fees. The remaining 38.5 percent of contributed capital would be paid, in the form of expense allowances, consulting fees, management fees, and financing fees, to Realty Properties and its affiliates, Summa T. Realty and Diversified Financial Services. In this instance, Summa T. Realty was to receive a total of $ 550,000 in consulting fees, including a fee of $ 357,500 for financial and tax consulting services which were to be rendered over the first 37 months of the Inn's operation. The tax consulting services related mostly to the design, organization, and coordination of the offering so as to provide significant tax benefits. Mr. Campbell participated in the provision of these tax services but was primarily involved in the provision of financial services (i.e., the selection and acquisition of properties). In addition, Realty Properties was to receive a total fee of $ 170,000 for arranging financing and providing a marketing and management plan. According to the offering memorandum, 97 *183 percent of the profits and losses of Airport were to be allocated to the Class A limited partners, 1 percent of the profits and losses were to be allocated to Realty Properties, and 1 percent of the profits and losses were to be allocated to each of the special limited partners, Mr. Campbell and Mr. Kane. Any cash available from the operations of Airport was to be used first to pay all sums due on partnership obligations, second to establish reasonable reserves, and third to make distributions to the partners. Prior to January 1, 1981, all cash available for distribution was to be paid to the general partner, Realty Properties. However, the general partner was obligated to advance up to $ 75,000 in working capital, which would be repaid without interest, if the partnership's cash flow was insufficient to cover its operating expenses and debt service payments. After January 1, 1981, any cash available for distribution was to be used first to pay annually to the Class A limited partners an amount equal to 10 percent of their capital contributions (the priority return). If cash was still available after annual distribution of this priority return, an amount equal to $ 2,075 would *184 be distributed annually to the general partner and each special limited partner. Thereafter, any remaining cash was to be allocated and distributed in accordance with partners' ratio for sharing profits and losses. According to projections contained within the offering memorandum, Airport was expected to incur a taxable loss in each of the years 1980 through 1987. In 1988 and 1989, Airport was expected to show taxable income. In the taxable year ending December 31, 1980, Airport was expected to incur a taxable loss in the amount of $ 738,585. This loss was, in large part, attributable to the deduction of consulting and management fees and amortization of the covenant not to compete. In addition, the projection reflects large deductions for interest expense and depreciation. According to the offering memorandum, Airport intended to allocate $ 210,000 of the total price it paid for the Inn to land and the remainder, $ 6,040,000, of the purchase price to buildings and other depreciable assets. Each Class A limited partner's distributive share of Airport's 1980 loss was projected to be $ 20,469 with a resulting tax benefit (assuming his income from other sources was taxed at rate *185 of at least 50 percent) of $ 10,235. In addition, each Class A limited partner would be entitled to claim an investment tax credit, passed through from the partnership, in the amount of $ 700. According to the figures contained in the offering memorandum, the remaining partners' (i.e., Mr. Campbell, Mr. Kane, and Realty Properties) distributive share of Airport's 1980 loss would be approximately $ 7,390 each and their distributive share of investment tax credit would be approximately $ 253 each. The offering memorandum for Airport warned, as did the offering memorandum for Phillips House and The Grand, that the partnership's positions with respect to certain deductions and credits were not based on settled interpretations of the tax laws and that the Internal Revenue Service might disallow any of the various deductions and credits claimed. Nevertheless, the offering memorandum projected that each Class A limited partner would receive $ 107,764 in tax losses from his investment in Airport but would also be charged with taxable income in the amount of $ 2,394. Each Class A limited partner would save approximately $ 52,686 in Federal income taxes (assuming his income from other *186 sources was taxed at a rate of at least 50 percent) over the 10 taxable years for which projections were available (1980 through 1989). Each Class A limited partner could also expect tax savings from utilizing $ 1,280 in investment tax credits passed through from Airport. According to the figures contained in the offering memorandum, the remaining partners (i.e., Mr. Campbell, Mr. Kane, and Realty Properties) could each expect to receive tax losses totaling approximately $ 38,904, taxable income totaling approximately $ 864, and investment tax credits totaling approximately $ 462. According to the offering memorandum, Airport did not project a positive cash flow from operations until 1982. In 1982, Airport anticipated sufficient cash flow to distribute $ 2,322 to each Class A limited partner. Airport did not anticipate sufficient cash flow to enable it to make distributions to the special limited partners and general partner until 1983. In 1983, Airport anticipated sufficient cash flow to enable it to distribute $ 7,316 to each Class A limited partner, $ 2,644 to each special limited partner, and $ 2,644 to the general partner. In 1984, Airport anticipated sufficient cash flow *187 to enable it to distribute $ 8,853 to each Class A limited partner, $ 3,194 to each special limited partner, and $ 3,194 to the general partner. In 1985, Airport anticipated sufficient cash flow to enable it to distribute $ 11,292 to each Class A limited partner, $ 4,079 to each special limited partner, and $ 4,079 to the general partner. In 1986, and each year thereafter for which projections were made, Airport was expected to have sufficient cash flow to enable it to distribute $ 10,965 per year to each Class A limited partner, $ 3,952 per year to each special limited partner, and $ 3,952 per year to the general partner. In addition to a share in the profits and losses of Airport, Mr. Campbell, Mr. Kane, and Realty Properties were entitled to share in any proceeds which might become available from the sale or refinancing of the Inn. The net proceeds from a sale or refinancing of the Inn were to be used first to pay all sums currently due on partnership obligations and second to establish reasonable reserves for the partnership. Any proceeds in excess of such amounts were to be used first to repay each Class A limited partner his original capital contribution (less any amounts *188 previously distributed as a return of capital). In addition, the general partner was to be repaid its original capital contribution ($ 20,000) less any amounts previously distributed as a return of capital. After return of the original capital contributions, 10 percent of the net proceeds from a sale or refinancing was to be paid to the special limited partners before any further amounts could be paid to the limited or general partners. Thereafter, 5 percent of the net proceeds, less $ 20,000 (the amount paid as a return of capital), was to be paid to the general partner. Finally, any remaining proceeds were to be distributed in a ratio of 85 percent to the Class A limited partners, 5 percent to each special limited partner, and 5 percent to the general partner. The general partner, Realty Properties, bore primary responsibility for management of Airport. The day-to-day management of the Inn itself was delegated to Summa-Sunn St. Louis, a joint venture between Summa Management Company, a member of the Summa T. Group, and Sunn Management Company. Summa-Sunn St. Louis was to receive a management fee equal to 4.25 percent of the gross revenues of the Inn in return for its management *189 services. As was the case with units in Phillips House and The Grand, there were restrictions placed on the transfer of limited partnership units in Airport. The offering memorandum and the certificate of limited partnership provided that no limited partner could transfer his interest in Airport without the consent of the general partner and that the general partner could arbitrarily withhold such consent. The sale of the units was not being registered under Federal or state securities laws and, according to the Airport offering memorandum, the limited partners would have no rights to require a registration. The offering memorandum also warned that no market existed or would develop for resale of the units. According to the Form 1065, "U.S. Partnership Return of Income," filed by Airport for its calendar year ending December 31, 1980, all 35 Class A limited partnership units in Airport had been sold by December 31, 1980. The return was prepared by the accounting firm of Baird, Kurtz and Dobson and bears the date April 11, 1981. An amended certificate of limited partnership, which listed the names and addresses of all participants in Airport (including Mr. Campbell), was recorded *190 on September 24, 1981. On its 1980 partnership return, Airport reported an ordinary loss in the amount $ 602,424. On its 1980 return, Airport reported a basis of $ 6,051,170 in buildings and other depreciable assets (i.e., the Inn) and calculated a deduction for depreciation based on this amount. Airport reported a basis of $ 210,000 in nondepreciable real property (i.e., the land on which the Inn stood). On March 25, 1981, Appraisal Consultants, Inc. submitted an appraisal report to Airport valuing the Inn and the land on which it stood at $ 6,250,000 as of March 12, 1981. Appraisal Consultants, Inc. allocated $ 400,000 of the total estimated value to nondepreciable real estate and $ 5,850,000 of the total estimated value to the Inn, its components, and accompanying personalty. Finally, Airport reported a basis in amortizable intangible assets (including the covenant not to compete) of $ 741,595 and calculated a deduction for amortization based on this amount. Airport attached a Schedule K-1, "Partner's Share of Income, Credits, Deductions, etc. -- 1980" for each Class A limited partner, each special limited partner, and the general partner. The Schedule K-1 issued to Mr. *191 Campbell (the 1980 Airport K-1) indicated that, on September 29, 1980, Mr. Campbell received a 1-percent interest in the profits, losses, and capital of Airport. According to the 1980 Airport K-1, Mr. Campbell's share of Airport's nonrecourse debt was $ 57,000 and his distributive share of Airport's ordinary losses was $ 6,024. In addition, the 1980 Airport K-1 indicates that Airport passed through a loss of $ 105 to Mr. Campbell as a separately accounted-for item. Finally, the 1980 Airport K-1 indicates that, as of December 31, 1980, Mr. Campbell's capital account in Airport had a negative balance of $ 5,979. On April 15, 1980, petitioners received an automatic extension to June 15, 1980 of the time in which they were required to file their joint Federal income tax return for their tax year ending December 31, 1979. On their 1979 return, petitioners deducted $ 102 as their share of ordinary losses passed through from Phillips House. Petitioners also reported a charitable contribution in the amount of $ 24,000 attributable to their interest in Phillips House. They were only able to deduct $ 4,089 of this amount on their 1979 return. The remainder, $ 19,911, was to be carried *192 over to their 1980 tax year. Petitioners did not report the receipt of the special limited partnership interest in Phillips House on their 1979 Federal income tax return. On April 15, 1981, petitioners filed for an automatic two-month extension to June 15, 1981 of the time in which they were required to file their joint Federal income tax return for their tax year ending December 31, 1980. On July 2, 1981, the time in which petitioners were required to file their 1980 return was further extended to August 15, 1981. On their joint Federal income tax return for their tax year ending December 31, 1980, petitioners deducted $ 36,374 as their share of ordinary losses passed through from Phillips House. They did not utilize any of the $ 19,911 carryover attributable to the 1979 charitable contribution by Phillips House. Petitioners also deducted $ 8,115 as their distributive share of losses from The Grand and $ 6,024 as their distributive share of losses from Airport. Petitioners did not report any income representing the value of the receipt of the special limited partnership interests in Phillips House, The Grand, or Airport on their 1980 Federal income tax return. In his notice *193 of deficiency, dated May 10, 1983, respondent determined that petitioners' 1979 and 1980 income as reported on their return overstated their distributive share of losses and understated their distributive share of income from the numerous partnerships in which they held an interest. With respect to their 1979 return, respondent determined that the correct amount of the 1979 charitable deduction to which petitioners were entitled as a result of their interest in Phillips House was $ 1,920 and that any carryover should be eliminated. Respondent also determined that petitioner's distributive share of losses from Phillips House for 1979 was zero. In addition, respondent determined that petitioners should have included in income the value of the 2-percent partnership interest they received in Phillips House which respondent valued at $ 42,084. With respect to their 1980 return, respondent determined that no amount of the $ 36,374 loss deducted by petitioners as their distributive share of loss from Phillips House was allowable. Respondent determined that, instead, Phillips House had taxable income for 1980 and that petitioners' distributive share of such income was $ 9,324. Respondent *194 further determined that petitioners were entitled to a specially allocated interest deduction of $ 1,881 from Phillips House. Respondent determined that petitioners' share of ordinary loss from The Grand for 1980 was $ 3,815, instead of the $ 8,115 deducted by petitioners on their 1980 return. Respondent further determined that petitioners' distributive share of ordinary loss from Airport was $ 1,148 rather than $ 6,024 as reported on their 1980 return. Respondent also determined that petitioners should have included in their 1980 income the value of the partnership interests Mr. Campbell received in The Grand and Airport. Respondent determined that the fair market value of these interests were $ 16,968 and $ 20,683, respectively. In an amendment to answer, respondent alleged that petitioners were also liable for additions to tax under section 6653(a) for the taxable years 1979 and 1980. Respondent alleged that petitioners, and particularly Mr. Campbell, were negligent in failing to include the value of the special limited partnership interests Mr. Campbell received in income in 1979 and 1980. Respondent also alleged that petitioners were negligent in deducting partnership *195 losses on their joint return which were unjustified and, in some cases, highly inflated. Prior to trial, the parties reached agreement on many of the issues raised in the petition. The parties stipulated that the correct amount of petitioners' share of the Phillips House charitable contribution was $ 6,000 and that the correct amount of petitioners' distributive share of loss from Phillips House for 1979 was zero. The parties also stipulated that petitioners' distributive share of loss from Phillips House for 1980 was zero. The parties stipulated that the correct amount of petitioners' distributive share of losses for 1980 from The Grand and Airport were $ 4,247.94 and $ 1,304.55, respectively. The parties have not reached agreement on whether petitioners were required to include in income the value of the partnership interests Mr. Campbell received or if so, the value of such interests and have reached no agreement with respect to the additions to tax asserted by respondent in his amendment to answer. OPINION Petitioners take the position that the interests Mr. Campbell received in Phillips House, The Grand, and Airport were merely interests in the profits of such partnerships *196 and, as such, the value, if any, of these interests should not be included in petitioners' income in the year of receipt. Petitioners base their arguments, in part, on section 721(a) (and the regulations thereunder) which provided for nonrecognition of income upon the receipt of a partnership interest under certain circumstances. Petitioners further argue that, even if section 721(a), and the regulations thereunder, are inapplicable to the present situation, the receipt of each partnership interest is governed by section 83 which provides the time of recognition of income where property is transferred to a taxpayer in exchange for his performance of services. Petitioners argue that, under section 83, they are permitted to defer recognition of income because the partnership interests were never "transferred" to them within the meaning of section 83 or, in the alternative, that the interests were subject to a substantial risk of forfeiture and thus were not taxable upon receipt even if they were transferred. Finally, petitioners argue that, even if the partnership interests were transferred to Mr. Campbell in return for the performance of services and such interests were not subject *197 to a substantial risk of forfeiture, the value of such interests was so speculative that the most which should be included in their income under either section 61 or section 83 is $ 1,000 per partnership interest. Section 61(a) stated the general rule that: Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items; * * * Thus, unless nonrecognition is provided for elsewhere, petitioners must include the value of the partnership interests which Mr. Campbell received in their income immediately upon receipt. Section 721(a) provides that no gain or loss is recognized to a partnership or the contributing partners, "in the case of a contribution of property to the partnership in exchange for an interest in the partnership." (Emphasis supplied.) Despite the fact that section 721, by its own terms, applies only where the recipient of a partnership interest contributes property in exchange for such interest, petitioners argue that the regulations issued under section 721 have enlarged the scope of *198 that section to also provide nonrecognition in situations where the contributing partner has contributed services, rather than property, in exchange for his partnership interest. Specifically, petitioners point to the language of section 1.721-1(b)(1), Income Tax Regs., which provides that: Normally, under local law, each partner is entitled to be repaid his contributions of money or other property to the partnership * * *. To the extent that any of the partners gives up any part of his right to be repaid his contributions (as distinguished from a share in partnership profits) in favor of another partner as compensation for services (or in satisfaction of an obligation), section 721 does not apply. * * * [Emphasis supplied.] Petitioners seize upon the language we have emphasized in the above-quoted regulation to support their argument that a distinction has been intentionally drawn in such regulation between situations in which a partner receives an interest in the capital of a partnership and situations in which a partner receives a mere profits interest. Petitioners argue that the former situation has been clearly excluded from nonrecognition treatment under section 721(a) *199 while the latter situation has, by negative implication, been clearly singled out for nonrecognition treatment by the regulations. We have previously addressed and rejected this same argument in Diamond v. Commissioner, 56 T.C. 530 (1971), affd. 492 F.2d 286 (7th Cir. 1974), a case with facts similar to those in the instant case. In the Diamond case, the taxpayer, who was a mortgage broker, arranged financing for an individual who owned a right to purchase an office building. In exchange for his services in arranging the loans necessary for the purchase of the building, the taxpayer was given a 60-percent interest in the profits and losses of a partnership which was subsequently formed to exploit the property. In the Diamond case, the individual for whom the taxpayer arranged financing was to contribute all cash needed in excess of the loan proceeds. In addition to an interest in the profits and losses of the partnership, the taxpayer was entitled to 60 percent of the proceeds from any sale of the office building, but only after repayment to the other individual of all cash advanced by him. Less than three weeks after acquiring his partnership *200 interest, the taxpayer sold his interest for $ 40,000. The taxpayer failed to include the value of the interest he received in income, but reported the gain from sale of the interest as short-term capital gain. The taxpayer in the Diamond case, argued, as do the petitioners in this case, that if a taxpayer receives an interest in partnership capital in exchange for the performance of services, he is required to recognize ordinary income immediately upon receipt of such interest but, if he merely receives an interest in the future partnership profits and losses in exchange for services, he may defer recognition of income under section 1.721-1(b)(1), Income Tax Regs. Without determining the exact nature of the partnership interest received by the taxpayer, we noted that, although the origin and effect of the parenthetical language in the regulation was by no means clear, nothing in section 1.721-1(b)(1), Income Tax Regs., explicitly required the application of section 721(a) to the situation before the Court. We further reasoned that the application of section 721 to a partnership interest which was received in exchange for a contribution of services would result in an impermissible *201 distortion of the language of the statute. In light of the fact that the taxpayer sold his interest for $ 40,000 just three weeks later, we rejected the taxpayer's argument that the interest he received was worthless. We therefore concluded that, under the general rule of section 61, the taxpayer was required to include the value of the interest he received in gross income immediately upon receipt. Diamond v. Commissioner, 56 T.C. at 545. On appeal, the Circuit Court of Appeals for the Seventh Circuit, which proceeded on the theory that the taxpayer had received a profits interest in the partnership, affirmed our decision. Diamond v. Commissioner, 492 F.2d 286, 291 (7th Cir. 1974), affg. 56 T.C. 530 (1971). The court suggested that regulations be issued to clarify the proper treatment of the receipt of a profits interest in exchange for services. The court concluded, however, that, in the absence of such regulations, it was best to sustain the decision of this Court. Petitioners state that our decision in the Diamond case, and to a lesser extent, the decision of the Seventh Circuit Court of Appeals in that case has been the *202 subject of much criticism (e.g., 1 A. Willis, Partnership Taxation, p. 125 (2d ed. 1976); Cowan, "Receipt of an Interest in Partnership Profits: The Diamond Case," 27 Tax Law Review 161 (1972)) and urge that, in light of this criticism, we reverse our holding in that case. Petitioners argue that in rejecting our position in the Diamond case, we should conclude, as a matter of law, that section 1.721-1(b)(1), Income Tax Regs., precludes the inclusion in gross income of the value of a profits interests received in exchange for services which have been rendered to a partnership. We reject petitioners argument that we should no longer follow our decision in the Diamond case and reaffirm our holding that section 721(a) and the regulations thereunder are simply inapplicable where, as in the Diamond case and the instant case, a partner receives his partnership interest in exchange for services he has rendered to the partnership. In order to invoke the benefits of nonrecognition under section 721(a), the taxpayer must contribute "property" to the partnership in exchange for his partnership interest. United States v. Stafford, 727 F.2d 1043, 1048 (11th Cir. 1984). *203 The Stafford case makes it clear that services are not "property" for purposes of section 721(a). The considerations which underlie section 721(a) nonrecognition treatment where a taxpayer receives a partnership interest in exchange for property are vastly different from those reasons advanced by petitioners in favor of section 721(a) nonrecognition treatment where a taxpayer receives a partnership interest in exchange for services. In the former situation, there has been no disposition of the contributed property. The partnership interest such partner receives represents a mere change in the form of an asset which the taxpayer already owns. Archbald v. Commissioner, 27 B.T.A. 837 (1933), affd. 70 F.2d 720 (2d Cir. 1934). In the latter situation, it represents compensation for services, the value of which has not previously been reported as income. In providing nonrecognition treatment, section 721(a) makes no distinction between the receipt of a capital interest and a profits interest. Therefore, it is inconsistent that petitioners, while conceding that a service partner who receives an interest in partnership capital is not relieved from *204 immediate taxation by section 721(a), argue that a service partner's receipt of a profits interest should be afforded nonrecognition treatment under section 721(a). After reexamining our holding in Diamond v. Commissioner, supra, we are convinced that section 721(a) is inapplicable to the receipt of any type of partnership interest in exchange for services. Putting aside for the moment the question of whether respondent could, by the issuance of regulations, significantly enlarge the scope of this clearly worded statute, we conclude that the language of section 1.721-1(b)(1), Income Tax Regs., does not lead to the result advanced by petitioners. As we noted in Diamond, section 1.721-1(b)(1), Income Tax Regs., is unartfully drafted, but this fact does not require an interpretation of the statute contrary to its clear words. In the instant case, we conclude from the evidence that petitioner received his interests in Phillips House, The Grand, and Airport in exchange for prior services. Those services included locating suitable properties for his employer, negotiating the acquisition of those properties, organizing the limited partnerships which would eventually acquire *205 those properties, and assisting in the preparation of offering materials in connection with the syndication of these limited partnerships. The records of the partnerships as shown in their respective returns of income show that Mr. Campbell acquired his interest in each partnership after the rendering of these services. Clearly, on this record, the listing of Mr. Campbell as the sole limited partner at formation in two of the partnerships was a matter of form and convenience and his substantive interest was not acquired until his services had been rendered as shown on the partnership records. In our view, the instant transaction is not within the scope of section 721(a). In our view, the determination of when Mr. Campbell should be required to include in income the value of the partnership interests he received in Phillips House, The Grand, and Airport is governed by section 83. Hensel Phelps Construction Co. v. Commissioner, 74 T.C. 939, 952 (1980), affd. 703 F.2d 485 (10th Cir. 1983). Under section 83 [3], if property is transferred to any person in connection with the performance of services, the person who performed the services is required to *206 include in income the fair market value of such property (less any amounts which were paid for such property) in the first taxable year in which such property becomes transferable or is not subject to a substantial risk of forfeiture, whichever occurs first. Thus, the operation of section 83 requires inclusion in income of the value of property transferred if three factors are present. *207 First, the thing transferred in connection with the performance of services must be "property" as that term is used in section 83. In our view, it cannot be seriously questioned that the interests which Mr. Campbell received in Phillips House, The Grand, and Airport were "property" within the meaning of section 83. Section 1.83-3(e), Income Tax Regs., provides that, "the term 'property' includes real and personal property other than either money or an unfunded and unsecured promise to pay money or property in the future." Under section 701 of the Uniform Limited Partnership Act (ULPA), as well as the corresponding laws of both Missouri and South Carolina, any partnership interest is personal property. Uniform Limited Partnership Act section 701, 9 U.L.A. (1976); Mo. Ann. Stat. section 359.401 (Vernon 1989); S.C. Code Ann. section 33-42-1210 (Law. Co-op. 1976). We see no reason why a different rule should obtain for Federal income tax purposes. Respondent argues that a pure profits interest in a partnership might be considered an unfunded and unsecured promise to pay money in the future and, therefore, excluded from the *208 definition of "property" within the meaning of section 83. Respondent reasons that, if the interests Mr. Campbell received are found to be pure profits interests, section 83 would not apply and the question of whether petitioners are taxable upon the receipt of such interests should be determined under the more general provisions of section 61. We need not discuss whether section 61 would be applicable in this case since we conclude that the interest transferred to Mr. Campbell in each of the partnerships was "property" within the meaning of section 83, so that section 83 governs its receipt. State law makes no distinction between an interest in partnership profits and an interest in partnership capital. Uniform Limited Partnership Act sections 101(10) and 701, 9 U.L.A. (1976); Mo. Ann. Stat. sections 359.011(10) and 359.401 (Vernon 1989); S.C. Code Ann. sections 33-42-20(10) and 33-42-1210 (Law. Co-op. 1976). Both are classified as personal property and, therefore, are literally within the terms of section 83. But see section 1.721-1(b)(1), Proposed Income Tax Regs., 36 Fed. Reg. 10799 (June 3, 1971). Furthermore, *209 a partnership profits interest is not a "promise to pay." The recipient of a promise to pay is generally entitled only to a fixed amount of money that is not specifically geared to the profits of a business. This is the case even though no funds have been set aside to secure payment of the fixed amount so that the payment may in fact be affected by the success of the business. In contrast, the holder of a profits interest in a partnership is not promised a fixed amount of money but, rather, is subject to the exigencies of the partnership's business. He may receive a windfall or he may receive nothing at all. Furthermore, in the instant case, the interest received by Mr. Campbell in each partnership was in profits and losses so that he was entitled to share in the partnership deductions. In fact, any partner, whether he holds a capital or a profits interest, will generally be allocated a distributive share of his partnership's losses and charitable deductions as was Mr. Campbell in this case. Because of the differences in the interests received by Mr. Campbell and a "promise to pay," we consider it immaterial whether the bundle of rights Mr. Campbell received in such partnership *210 is denominated as a profits interest or a capital interest. In either event, they bear no resemblance to "an unfunded and unsecured promise to pay money or property in the future" which, along with money, is excluded from the definition of property within the meaning of section 83 by section 1.83-3(e), Income Tax Regs. Therefore, we conclude that the interest transferred to Mr. Campbell in each of the partnerships was property within the meaning of section 83. The second factor which must be present for section 83 to govern the inclusion in income of the value of property is that such property must be transferred in connection with the performance of services. Section 1.83-3(a)(1), Income Tax Regs., provides that, "For purposes of section 83 and the regulations thereunder, a transfer of property occurs when a person acquires a beneficial ownership interest in such property * * *." Petitioners argue that a section 83 "transfer" in connection with the performance of services never took place with respect to Mr. Campbell's interests in Phillips House and The Grand. They argue that he acquired his original limited partnership interests, upon formation of the partnerships, in exchange *211 for a capital contribution of $ 100 and $ 150, respectively. Petitioners argue that there is nothing in the record which would indicate that the amount contributed by Mr. Campbell did not accurately reflect the true value of the partnership interests at the time of the contributions. Petitioners further argue that any increase in the value of such interests after this initial contribution was "sweat equity" which accrued as a result of Mr. Campbell's efforts in bringing the partnership's business to fruition. Petitioners argue that they are no more liable for taxes on such increase than they would be if Mr. Campbell had owned stock that increased in value as a result of his efforts. Thus, petitioners contend that there was never a "transfer" in connection with performance of services from Phillips House and The Grand within the meaning of section 83. Instead, petitioners argue, Mr. Campbell acquired valuable interests in such partnerships as a result of his capital contributions and his own hard work. It is elementary that, for purposes of Federal taxation, the substance of a transaction, rather than its form, will control. Diedrich v. Commissioner, 457 U.S. 191 (1982); *212 Crane v. Commissioner, 331 U.S. 1 (1947); Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929). While it may be true that, in form, Mr. Campbell was the original limited partner in both Phillips House and The Grand and that he purchased these partnership interests for a nominal amount of cash, it is apparent that, upon formation, these partnerships were nothing more than empty shells awaiting syndication. The interests he acquired were not intended to create a substantive partnership interest, but were used only as a means of syndicating the partnerships in order to sell limited partnership interests to investors at substantial prices. Mr. Campbell in substance had no beneficial interest in either of these partnerships upon its formation. We conclude that, in substance, Mr. Campbell acquired a beneficial interest in these partnerships at a later date in connection with the performance of services for his employer and as part of his renegotiated compensation package. The limited partnership interests Mr. Campbell received in return for his nominal capital contributions bear little resemblance to the special limited partnership interests he was *213 to eventually receive. Under the original certificates of limited partnership for Phillips House and The Grand, Mr. Campbell was entitled to limited partner status along with all the rights which accompanied such status (an insubordinate right to partnership profits, limited statutory voting rights, etc.). Yet, in the offering memorandums and amended certificates of limited partnership, he had been "demoted" to the status of special limited partner. Furthermore, although Mr. Campbell (as sole limited partner) was originally entitled to the vast majority of partnership profits (95 percent in the case of Phillips House and 97 percent in the case of The Grand), he ended up with only a 1- or 2-percent beneficial interest. These facts make it clear that, from the outset it was contemplated that the beneficial interests which Mr. Campbell eventually would receive were to be quantitatively and qualitatively different from those he in form received in exchange for his nominal capital contributions. The Schedules K-1 issued by Phillips House and The Grand indicate that Mr. Campbell did not, in fact, acquire the interests in such partnerships upon formation. According to the original certificate *214 of limited partnership for Phillips House, the partnership was formed in October 1979 with Mr. Campbell as the sole limited partner. However, Mr. Campbell's 1979 Phillips House K-1 indicates that he acquired his beneficial interest in Phillips House on December 28, 1979, the same day on which the other special limited partner, Mr. Kane, and the general partner, Realty Properties, acquired their interests in the partnership. Similarly, the 1980 Schedules K-1 issued by The Grand indicate that Mr. Campbell, Mr. Kane, and Realty Properties all acquired their respective interests in The Grand on November 2, 1980, nearly a month and a half after the original certificate of limited partnership (by which Mr. Campbell in form was the sole limited partner) was filed. The treatment of these transactions on the Schedules K-1, while not controlling, indicates that the parties considered the transfers as taking place after formation of the partnerships and the rendering of services by Mr. Campbell. In any event, as is clear from the record, the nominal amount Mr. Campbell purportedly paid for each of the two partnership interests bore no relation to the value of the different interests he received *215 for his services. Finally, as respondent points out, the special limited partnership interest in Airport, which petitioners admit was transferred to Mr. Campbell in connection with his performance of services, is virtually identical to the interests which Mr. Campbell contends he retained in Phillips House and The Grand. To tax the receipt of the former, but not the receipt of the latter, merely because Mr. Campbell was required by his employment to become in form the original limited partner in these shell limited partnerships, would be to ignore reality. According to his own testimony, Mr. Campbell received interests in such partnerships pursuant to his renegotiated compensation package. It is undisputed that Mr. Campbell's beneficial interest in Airport was transferred to him in connection with the performance of services for his employer. We hold that valuable and beneficial special limited partnership interests in Phillips House and The Grand, as well as Airport, were transferred to Mr. Campbell in 1979 and 1980 in connection with the syndication activities which he performed for his employer. Thus, Mr. Campbell's receipt of special limited partnership interests in Phillips *216 House, The Grand, and Airport, falls squarely within the receipt of property for services within the meaning of section 83. A final factor which must be present before section 83 will require inclusion in income of the value of property transferred in connection with the performance of services is that either the property transferred must be transferable by the recipient or the property transferred must not be subject to a substantial risk of forfeiture. Both parties apparently recognize that there were restrictions on Mr. Campbell's rights to transfer his interests in Phillips House, The Grand and Airport. However, petitioners contend that section 83 does not require petitioners to include in income the value of the interests which Mr. Campbell received in Phillips House, The Grand, and Airport because such interests were subject to a substantial risk of forfeiture. In support of their contention that Mr. Campbell's interests were subject to substantial risk of forfeiture, petitioners cite section 83(c)(1) which provides that for purposes of section 83, "The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment *217 of such property are conditioned upon the future performance of substantial services by any individual." (Emphasis supplied.) Petitioners also quote section 1.83-3(c)(2), Income Tax Regs., which they contend is directly applicable to the interests Mr. Campbell received. Petitioners liken the special limited partnership interests which Mr. Campbell received to so-called "earn-outs" under which the purchase price paid to the seller of a business interest is dependent upon the future performance of the business. Petitioners point out that Mr. Campbell would not receive any cash distributions from the partnerships until their earnings had increased to the point where the Class A limited partners could be paid an annual 10-percent return on their investments. Also, since each of the partnerships incurred substantial indebtedness in financing and acquiring their primary asset, Mr. Campbell would not participate in any proceeds from the sale or refinancing of these assets unless there was a substantial increase in their value. Petitioners apparently conclude that Mr. Campbell would receive nothing from the partnerships until their economic performance improved and, therefore, his *218 full enjoyment of the special limited partnership interests was conditioned on his future performance of substantial services in improving the economic performance of the partnerships. There are several fatal flaws in petitioners' arguments. In arguing that the performance levels of the partnerships would affect whether Mr. Campbell is required to include the value of the special limited partnership interests in income, petitioners incorrectly focus on the value of such interests rather than the fact of their receipt. It is true that, if the partnerships did not reach certain performance levels, Mr. Campbell might never receive cash distributions or participate in the proceeds from the sale or refinancing of the partnerships' primary assets. In such case, Mr. Campbell's interests in such partnerships might turn out to be worth only the value of the tax benefits he was to receive. However, this speculative aspect of the special limited partnership interests does not render them subject to a substantial risk of forfeiture. Section 1.83-3(c)(1), Income Tax Regs. It merely affects their value, not the fact of their receipt or the requirement that their value, if any, be included *219 in income. The instant case is akin to a situation in which an employee receives, in connection with his performance of services, unrestricted common stock in his corporate employer which is subordinated to preferred stock in both dividends and liquidation proceeds. Even though the corporation may eventually go bankrupt resulting in the worthlessness of the transferred stock, even though the corporation's board of directors may choose to never declare dividends, even though such corporation's economic performance may never allow the employee's participation in a dividend declaration, and even though the liquidation of such corporation may not result in sufficient proceeds to allow a distribution to the employee, it is clear that the employee has received property in the form of stock, the value of which must, under section 83, be included in income upon receipt. There is no sound reason why a different result should obtain merely because the interest received is a partnership interest rather than stock. We also conclude that petitioners' substantial reliance on section 1.83-3(c)(2), Income Tax Regs., is misplaced. That regulation provides in part that, "Where an employee receives *220 property from an employer subject to a requirement that it be returned if the total earnings of the employer do not increase, such property is subject to a substantial risk of forfeiture." (Emphasis supplied.) Section 1.83-3(c)(2), Income Tax Regs. Petitioners conclude, without discussion, that it is unnecessary for a transferor to actually recover possession of the property rights transferred as long as such rights are extinguished (i.e., through bankruptcy) if the total earnings of the employer do not increase. Petitioners' position ignores the requirement that the forfeited property be returned to the employer when increased earnings do not materialize. Such requirement may have been inserted in the regulations to cover precisely the situation present here (e.g., where an employer transfers an interest in a business to an employee and relinquishes any right to a return of such interest even if earnings do not increase). Petitioners have presented no employment contract or other evidence which would indicate that Mr. Campbell's right to retain the special limited partnership interests transferred was contingent on the future economic performance of the partnerships or *221 that his employer would require the return of such interests if certain performance levels were not met. Section 83 taxes the transfer of "property" in connection with the performance of services. The "property" transferred to Mr. Campbell was the special limited partnership interest he received in each partnership. These interests became vested, at the very latest, when each partnership reached the minimum subscription amounts necessary for the partnership to become operational. Once such amounts were obtained, there was no substantial risk that Mr. Campbell would be required to forfeit his special limited partnership interests to his employer, or otherwise forfeit such interests. Petitioners must, therefore, include the value of such interests in income upon receipt. Since we conclude that this value of the special limited partnership interests which Mr. Campbell received in connection with his performance of services for his employer should have been included in petitioners' income under section 83, it is necessary to determine the fair market value of such interests. In his notice of deficiency, respondent valued Mr. Campbell's 2-percent special limited partnership interest *222 in Phillips House at $ 42,084, his 1-percent special limited partnership interest in The Grand at $ 16,818, and his 1-percent special limited partnership interest in Airport at $ 20,683. Respondent based his valuations on three factors: 1) the size of Mr. Campbell's interest in each partnership; 2) the amount the Class A limited partners had paid per unit for their interest in each partnership; and 3) the number of Class A limited partnership units outstanding for each partnership as of the end of the taxable year at issue. On brief, respondent has asserted that the special limited partnership interests which Mr. Campbell received in Phillips House and The Grand are worth more than the values determined in the notice of deficiency and that the special limited partnership interest he received in Airport is worth less. Respondent did not call an expert witness at trial nor did he submit any expert reports to support the values he asserts on brief. Instead, respondent determined the value of each special limited partnership interest by discounting the future value of the tax benefits and cash distributions which, according to the projections contained in each partnership's offering *223 memorandum, Mr. Campbell would be entitled to receive from the inception of the partnerships until liquidation. In determining the present value in 1979 of the tax and cash benefits which Mr. Campbell was projected to receive through his interest in Phillips House, respondent utilized an overall discount rate of 17.9 percent. Respondent obtained this rate by determining the discount rate necessary to reduce the future value of the projected tax and cash benefits which a Class A limited partner, owning a single Class A limited partnership unit, would receive from the partnership to a present value which was equal to the amount paid by such partner for such unit. Similarly, respondent obtained and utilized an overall discount rate of 14.35 percent in determining the present value of the tax and cash benefits which Mr. Campbell was to receive from his interest in The Grand and an overall discount rate of 26.8 percent in determining the present value of the tax and cash benefits Mr. Campbell was to receive from his interest in Airport. By applying the discount rates he obtained, respondent assigned a present value of approximately $ 16,665, $ 5,757, and $ 6,536 to the projected cash *224 distributions to Mr. Campbell from Phillips House, The Grand, and Airport, respectively. Respondent contends that the balance of the value of each partnership interest is attributable to the present value of the tax benefits which Mr. Campbell was projected to receive. For purposes of determining the tax and cash benefits available to Mr. Campbell and the Class A limited partners, respondent assumed that each partnership would liquidate or sell its primary asset in 1989 when the tax benefits available to each partnership would decline dramatically. In the case of all three partnerships, respondent determined that Mr. Campbell would not be entitled to any proceeds if each partnership sold or liquidated its primary asset in 1989 and, therefore, the value of Mr. Campbell's special limited partnership interests should not reflect this component of the bundle of rights he received. On brief, respondent asks that we find as ultimate facts that, as of the time the interests which Mr. Campbell received had vested, his interest in Phillips House had a fair market value of approximately $ 67,000, his interest in The Grand had a fair market value of approximately $ 30,000, and his interest *225 in Airport had a fair market value of approximately $ 19,000. Petitioners object to respondent's valuations. Initially, petitioners claim that the value of each of the special limited partnership interests was so speculative that the interests should not be included in their income at all. In support of their claim, petitioners cite Diamond v. Commissioner, 492 F.2d 286 (7th Cir. 1974), affg. 56 T.C. 530 (1971), discussed previously, in which the Seventh Circuit stated that: There must be a wide variation in the degree to which a profit-share created in favor of a partner who has or will render service has a determinable market value at the moment of creation. Surely in many if not the typical situations it will have only speculative value, if any. Diamond v. Commissioner, supra at 290. Petitioners further contend that, even if the special limited partnership interests are capable of valuation, their value is far less than the values advanced by respondent in his notice of deficiency or on brief. In support of this contention, petitioners point to the testimony and appraisal reports of Mr. Steven Blumreich, an expert on *226 valuation of intangible assets, who appraised each of Mr. Campbell's interests and testified on petitioners' behalf at trial. Mr. Blumreich based his computations on the same factors which entered into respondent's computations, namely the value of the projected tax and cash benefits inherent in each interest. However, Mr. Blumreich evaluated these factors differently from respondent. Mr. Blumreich also computed the present value of the cash benefits which Mr. Campbell was to receive by computing and applying a discount rate to the projected cash distributions from each partnership. Mr. Blumreich obtained the discount rates he utilized by multiplying the 1979 Baa Corporate Bond Rate of 12.22 percent and the 1980 Baa Corporate Bond Rate of 15.19 percent by a factor of 2.5. Thus, Mr. Blumreich determined that the present value of the projected cash distributions of Phillips House, The Grand, and Airport were $ 8,407, $ 1,692, and $ 4,207, respectively. Although Mr. Blumreich acknowledged the existence of substantial tax benefits, he assigned no value to these tax benefits because, according to the partnership offering memorandums, there was a substantial risk that such benefits *227 would be eliminated if the partnerships were audited by respondent. Like respondent, Mr. Blumreich assigned no value to the possibility that Mr. Campbell might receive proceeds upon the sale or liquidation of each partnership's primary asset. However, unlike respondent, Mr. Blumreich also took into account separately factors such as restrictions on transfer of the special limited partnership interests and lack of participation in the management of the limited partnerships. Taking into account these various factors, Mr. Blumreich without further explanation determined that each of the special limited partnership units was worth no more than $ 1,000 upon its receipt. According to section 83, a taxpayer must include in income the fair market value of property transferred in connection with services (determined without regard to any restriction other than a restriction which by its terms will never lapse). The restriction on transferability of the limited partnership interest was clearly not a restriction which by its terms would never lapse and, therefore, we need not take such restriction into account in determining "fair market value." Section 83(a). The term "fair market value" *228 generally refers to the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Hamm v. Commissioner, 325 F.2d 934, 937 (8th Cir. 1963), affg. a Memorandum Opinion of this Court; Estate of Gilford v. Commissioner, 88 T.C. 38, 48 (1987); section 1.170A-1 (c) (2), Income Tax Regs.; section 1.20.2031-1 (b), Estate Tax Regs. The determination of fair market value is an inherently imprecise process. Estate of Gilford v. Commissioner, supra at 50; Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980). While the criteria to be applied in determining an asset's fair market value are a matter of law, the determination itself is essentially a matter of fact. Morris v. Commissioner, 761 F.2d 1195, 1200 (6th Cir. 1985), affg. a Memorandum Opinion of this Court; Estate of Gilford v. Commissioner, supra at 50; Parker v. Commissioner, 86 T.C. 547, 562 (1986). The testimony of experts on valuation may well assist the *229 trier of fact in making this determination. Fed. R. Evid. 702. However, such evidence must be weighed in light of all evidence in the record. Carland v. Commissioner, 90 T.C. 505, 550 (1988); Parker v. Commissioner, supra at 561. Although we may not, without sound reason, disregard expert testimony on the question of valuation, we may reject all or a portion of the opinion of any expert which it is contrary to our sound judgment. Carland, Inc. v. Commissioner, supra at 550; Parker v. Commissioner, supra at 561. In the instant case, the testimony of petitioners' expert, Mr. Blumreich, is in some respects not based on sound reasoning. We reject Mr. Blumreich's suggestion that the value of the interests which Mr. Campbell received was speculative at best. There were sales of similar interests at concrete prices shortly before, shortly after, and on the very same day that Mr. Campbell received his special limited partnership interests. Thus, even if the dictum petitioners quote from Diamond v. Commissioner, 492 F.2d 286 (7th Cir. 1974), affg. 56 T.C. 530 (1971), *230 could be interpreted as allowing the exclusion from income of the value of partnership interests where such value is speculative, such dictum has no application in the instant case. We also reject outright Mr. Blumreich's characterization of the value of each partnership interest as merely de minimis. Mr. Blumreich committed several errors in evaluating the benefits to which petitioners were entitled. For example, Mr. Blumreich erred in failing to assign any value at all to the tax benefits inherent in each special limited partnership interest, even though he clearly recognized that the tax benefits comprised a major portion of the benefits which Mr. Campbell, as well as the limited partners who purchased their interests, received. In 1979 and 1980 alone, petitioners utilized on their returns approximately $ 54,704 in tax losses distributed to them from the partnerships. It is true that some of the items that generated these losses were questionable. However, the Class A limited partners were willing to pay substantial amounts for these very same tax losses despite the chance that some of them might be disallowed. In the instant case, respondent in his notice of deficiency *231 did not disallow all the charitable deductions and tax losses claimed by petitioners from the partnerships or the investment tax credits distributed to petitioners from the partnerships. Mr. Blumreich's disregard of these benefits indicates to us that his evaluation of this factor is incorrect. Mr. Blumreich's conclusion that the value of each partnership interest is $ 1,000 is equally unfounded. The business and economic position of each limited partnership, the purchase price of interests in each limited partnership, the projected cash distributions, and the projected tax benefits of each partnership varied widely. Despite the wide variations in those components which admittedly make a venture risky, Mr. Blumreich determined that each special limited partnership interest had exactly the same value, $ 1,000. Although valuation is an inherently imprecise process, we are not required to accept an expert valuation which is unreasonable, without basis, and quite obviously plucked out of thin air. Tripp v. Commissioner, 337 F.2d 432, 434 (7th Cir. 1964), affg. a Memorandum Opinion of this Court; Carland, Inc. v. Commissioner90 T.C. 505, 550 (1988); *232 Parker v. Commissioner, 86 T.C. 547 (1986). On the other hand, we also find respondent's valuation of Mr. Campbell's special limited partnership interests to be flawed primarily by the discount rate he used. Respondent obtained the discount rate which he applied to Mr. Campbell's tax and cash benefits by determining the rate necessary to discount the future value of the cash and tax benefits attributable to a single Class A limited partnership unit to the price paid by such Class A limited partners in substantially contemporaneous transactions. Two assumptions underlie respondent's discount rate calculations: first, that the partnerships would be liquidated in 1989 upon the exhaustion of the tax benefits associated with the Class A limited partnership units and, second, that the Class A limited partners would receive nothing upon the sale or liquidation of the partnership's primary asset. However, there is little basis for either assumption in this record. It is true that the tax benefits available to a Class A limited partner quite obviously played a major role in his decision to invest. However, this does not support an inference that the Class A limited *233 partners and the partnership would be willing to abandon future distributable cash from operations, as well as their substantial capital investment, in a year where liquidation or sale would result in little or no distributable proceeds. Both parties appear to agree that there was very little realistic chance that a disposition would result in enough proceeds to repay the general partner's capital contributions or make a distribution to the special limited partners. However, it does appear likely that, within the foreseeable future, there would be sufficient proceeds to repay at least a portion of the Class A limited partners' capital contributions. Even if the partnerships did liquidate in 1989 as projected by respondent, the limited partners could expect to receive some return of their capital investment in The Grand and Airport. Thus, we conclude that respondent erred in failing to include any post-1989 potential cash distributions or disposition proceeds in the cash benefits which a Class A limited partner would receive. As a result of this failure, the discount rate which respondent obtained was artificially low and, thus, the values which he assigned to the special limited *234 partnership interests were too high. Respondent and petitioners' expert used the same method of valuing the interests petitioners received except for respondent's use of too low a discount rate and petitioners' failure to include in the value of the interests the tax benefits which petitioners anticipated receiving. We accept the method used by the parties. We conclude that the value of the tax benefits should be included in making the valuation but that the discount rate used by petitioners' expert should be applied since it is more realistic than the discount rate used by respondent. In our view since financing of the acquisitions of the properties of The Grand and Airport had been completed in 1980 as of the date of valuation of petitioners' special limited partnership interests, the valuation of petitioners' interests in The Grand and Airport on the basis used by both parties but including the value of tax benefits and using petitioners' discount rate results in the fair market value of these interests. The computation for The Grand results in approximately the value for petitioner's interest in that partnership determined in the notice of deficiency or $ 16,818. We therefore *235 sustain respondent's determination as set forth in the notice of deficiency as to the value of petitioner's interest in The Grand. Our computation of the fair market value of petitioner's interest in Airport as of the time it was received in 1980 on the basis set forth above is approximately $ 15,000. We therefore hold that petitioners should include in their income for 1980 the amount of $ 15,000 as the value of the interest Mr. Campbell received in Airport for services rendered. The situation as to Phillips House is quite different. Petitioner received his 2-percent interest at the end of 1979 when the principal financing had not been completed. Certainly the limited partners who had paid $ 99,250 each for their limited partnership interests valued their interests at the amount they paid. However, they have superior rights to petitioner especially if a liquidation became necessary. The prospect of completion of the funding of the partnership appeared good at the end of 1979 but it was not certain. In our view, this fact as of the end of 1979 would have resulted in a willing buyer of petitioner's interest demanding a further discount. When we compute the value of petitioner's *236 interest in Phillips House, as we did his interest in The Grand and Airport, the value of his interest comes out to be approximately $ 50,000. While in our view the evidence does not support a conclusion that the uncertainties at the end of 1979 caused the value of petitioner's interest in Phillips House to be only $ 1,000 as petitioners' expert concluded, it would require a substantial reduction of the $ 50,000 computed value. At the same time petitioner received his 2-percent special limited partnership interest for services in 1979, the general partner paid $ 30,000 for a 2-percent interest with approximately the same tax benefits and distribution rights as petitioner's interest had. We recognize that a general partnership interest has rights and liabilities which differ from those of a limited partner. However, the $ 30,000 payment by the general partner for a financial interest quite comparable to petitioner's special limited partnership interest is persuasive evidence that petitioner's 2-percent special limited partnership interest in Phillips House had much more than a nominal value at the end of 1979. Considering the evidence as a whole, we conclude that an additional *237 50-percent discount on the $ 50,000 computed as set forth above is appropriate to determine fair market value of the interest petitioner received in Phillips House in 1979. We hold that the fair market value of the interest petitioner received in Phillips House in 1979 for services was $ 25,000 at the time of its receipt and that this amount is includable in petitioners' income for 1979. The final issue for decision is whether petitioners are liable for additions to tax under section 6653 (a). Respondent bears the burden of proof on this issue since he first asserted the additions to tax in an amendment to answer. Rule 142 (a). During the years at issue, section 6653 (a) provided that: If any part of any underpayment * * * is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment. Negligence is generally defined as a failure to exercise due care or a failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Forseth v. Commissioner, 845 F.2d 746, 749 (7th Cir. 1988), affg. 85 T.C. 127 (1985); *238 Neely v. United States, 775 F.2d 1092, 1095 (9th Cir. 1985); Crocker v. Commissioner, 92 T.C. 899, 916 (1989). If any portion of an underpayment in any one year is due to negligence or intentional disregard of the rules and regulations, then the 5-percent addition to tax under section 6653 (a) will be computed on the basis of the entire underpayment for such year. Commissioner v. Asphalt Products Co., 482 U.S. 117 (1987); Crocker v. Commissioner, supra at 916-917. Respondent alleges that a portion of petitioners' underpayments for both 1979 and 1980 was due to negligence or intentional disregard of the rules and regulations. In support of his allegations, respondent first claims that Mr. Campbell was intimately involved in the structuring, syndication, financing, and management of each partnership. He also notes that Mr. Campbell was a sophisticated businessman who, as an employee of Summa T. Realty, provided financial and tax consulting services to the partnerships. Respondent then points to several instances of abusive deductions, which were passed through from the partnerships and deducted by petitioners *239 on their joint return, which he claims demonstrates petitioners' negligence and intentional disregard of the rules and regulations. With respect to 1979, respondent claims that petitioners were negligent in deducting $ 102 in losses passed through from Phillips House because such loss included startup and organizational expenses which should not have been deducted until the Hotel opened for business in 1981. In addition, as respondent points out, the partnership's amortization deduction was artificially inflated due to inclusion of the entire nonaccountable expense allowance of $ 104,213, even though Diversified Financial Services had sold only 20 partnership units by the end of 1979. Furthermore, respondent states that the nonaccountable expense allowance, because it was calculated strictly as a percentage of the offering proceeds, was actually a disguised sales commission and thus a nondeductible cost of syndication under section 709. With respect to 1980, respondent states that the large consulting fees paid to Realty Properties, Summa T. Realty, and other members of the Summa T. Group by all three partnerships were also disguised sales commissions or other syndication costs *240 which should not have been reported as amortizable organizational expenses on the partnership's 1980 return and should not have been deducted on petitioners' 1980 return. Respondent also claims that The Grand and Airport abusively allocated too little of the purchase price of each property to nondepreciable land in order to increase their depreciation allowances for buildings and equipment. Respondent claims that petitioners were negligent in claiming these increased depreciation deductions on their joint return which was filed after the partnerships had received appraisal reports indicating that a much greater portion of the purchase prices should have been allocated to nondepreciable land. Respondent further claims that the purchase price of the Inn which Airport purchased from S.T. Properties, another member of the Summa T. Group, was abusively inflated by $ 1,000,000 in order to increase depreciation deductions and that the basis of such property should have been limited to its fair market value. Finally, respondent claims that the covenants not to compete for which The Grand and Airport paid $ 350,000 and $ 250,000, respectively, were shams because there was no realistic possibility *241 that the Summa T. Group would compete with the partnerships anyway and were merely designed to increase the partnerships' losses through amortization deductions. Respondent concludes that, given Mr. Campbell's contacts with the partnerships and his position within Realty Properties as well as the other members of the Summa T. Group, he must have been aware that these deductions were abusive and, therefore, petitioners were negligent in deducting their distributive share of these amounts on their returns. The parties disposed of the issues respecting the deductions and credits petitioners claimed in 1979 and 1980 by agreement at substantially lesser amounts than claimed by petitioners so that it was unnecessary for us to determine the correct amount of these items. However, the documentary evidence of record shows that the amounts of such deductions claimed by petitioners on their returns for 1979 and 1980 were greatly in excess of the allowable amounts. Petitioners do not appear to dispute this fact. They primarily argue that respondent has failed to show that Mr. Campbell was aware of this fact. We conclude that respondent has met his burden of proving that a portion of petitioners' *242 underpayment for 1979 and 1980 was due to negligence or intentional disregard of the rules and regulations. As noted by respondent, Mr. Campbell was an experienced businessman and the vice president of many of the Summa T. Group entities, including Realty Properties (the general partner of each partnership), Diversified Financial Services (the selling agent for each partnership offering), Summa T. Realty (the tax and business consultant to each partnership), Summit Mortgage Company (the entity from which The Grand purchased its primary asset), and Summa Management Company (the co-manager of The Grand's and Airport's lodging facilities). By his own admission, he was intimately involved in the structuring, organization, promotion, and financing of the partnership syndications. Mr. Campbell also testified that he was involved in the preparation of the offering memorandums for each partnership. Thus, he knew (or should have known) that the tax benefits which the partnerships intended to claim were questionable and, in some cases, just plain abusive. For example, with respect to 1979, the offering memorandum projects that Phillips House will claim a deduction of approximately $ 2,000 *243 attributable, in part, to the partnership's amortization of organizational expenses, and that the partnership's amortization deduction included a nonaccountable expense allowance of $ 104,273 applicable to the sale of 35 limited partnership interests. Petitioner was familiar with the tax benefits each memorandum advertised. These projections were prepared, as Mr. Campbell knew, on the assumption that all 35 Class A limited partnership units would be sold. Given his intimate involvement in the sale, promotion, and financing of Phillips House, he also knew that, as of December 31, 1979, only 20 limited partnership units had been sold. Therefore, even assuming that a nonaccountable expense allowance that is calculated strictly as a percentage of syndication proceeds is a cost of organization rather than syndication, petitioners were patently negligent in claiming a deduction for expenses which they were well aware had not yet been incurred. Under such circumstances, it is irrelevant that Mr. Campbell may not have been directly involved in the preparation of the partnership's tax return. We conclude that an addition to tax under section 6653 (a) is appropriate for petitioners' 1979 *244 tax year. Similarly, with respect to losses passed through and deducted by petitioners on their 1980 tax return, Mr. Campbell knew through his involvement in the promotion, sale, and financing of each partnership, that the basis for these deductions was, at best, questionable. In the case of both The Grand and Airport, the primary asset of each partnership was acquired from a related entity at a price which reflected a substantial and completely unjustified mark-up over the price paid by such related entity to an unrelated party just a few months before. In the case of The Grand, the price of the Motel was inflated by approximately $ 326,614. The mark-up represented a covenant on the part Summit Mortgage Company and other members of the Summa T. Group not to compete for six months which the parties valued at approximately $ 350,000. Given the fact that the length of the covenant was extremely short, that the likelihood of competition was very small, and that the parties were related and, therefore, not adverse, we consider it clear that the covenant had no economic substance. We consider it more than a mere coincidence that the price of the covenant exactly equalled the amount *245 of Federal income taxes due on liquidation for which Summit Mortgage Company had assumed responsibility. Petitioners' own expert witness found no evidence of appreciation in the property purchased by The Grand between the date of acquisition from the unrelated seller to the date of sale to The Grand and, thus, disregarded the covenant not to compete in valuing Mr. Campbell's interest. In the case of Airport, the purchase price of the Inn was inflated by approximately $ 1,000,000, $ 250,000 of which was also attributable to a questionable covenant not to compete. Once again, petitioners' own expert could find no evidence of appreciation between July 1980, the month in which a related entity, S.T. Properties, acquired the property from an unrelated seller, and the date on which S.T. Properties sold the Inn to Airport. By his own admission, Mr. Campbell was intimately involved in the acquisition and financing of these properties and must have been aware of these gross inflations of purchase price. We are certain that, given his involvement, Mr. Campbell was also aware that the allocation of these purchase prices between depreciable and non-depreciable real property was questionable. *246 The appraisal which each partnership received prior to the filing of petitioners' return conclusively demonstrated that the allocations chosen were incorrect. Given his position in the Summa T. Group and his intimate involvement in the acquisition of the partnerships' properties, it is reasonable to assume that Mr. Campbell would have seen these appraisals prior to the time petitioners filed their joint Federal income tax returns for 1980. We, therefore, conclude that petitioners were negligent in 1980 in claiming deductions based on the inflated purchase prices of the partnerships' primary assets and the misallocation of such purchase prices between depreciable and nondepreciable property. Since we have concluded that the part of the deficiencies due to petitioners' claiming excessive deductions and credits in each year here involved was due to negligence, we need not discuss whether petitioners' failure to include in each year any amount as the value of a partnership interest received for services rendered was negligent. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The total purchase price of the Motel, $ 11,125,000, exceeds the combined total of these payments, assumed notes, and issued notes, $ 11,122,347, by approximately $ 2,653. However, this discrepancy is not relevant to our determination herein.↩
3. Section 83 provides: (a) General Rule. -- If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of -- (1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over (2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. * * *↩