ROBERT JOHNSTON AND PHYLLIS JOHNSTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Johnston v. Commissioner
Docket No. 6290-93
United States Tax Court
T.C. Memo 1995-140; 1995 Tax Ct. Memo LEXIS 134; 69 T.C.M. (CCH) 2283; March 29, 1995, Filed *134 Decision will be entered for Respondent. For petitioners: Morton S. Taubman. For respondent: Richard D. Fultz. CHIECHI
CHIECHI
MEMORANDUM FINDINGS OF FACT AND OPINION CHIECHI, Judge: Respondent determined the following deficiency in, and additions to, petitioners' Federal income tax: Additions to Tax
Section
Section Section Year
Deficiency
6653(a)(1)[1]
6653(a)(2)
6661
1982
$ 40,404
$ 2,020 *
$ 10,101
* 50 percent of the interest due on the portion of the
underpayment attributable to negligence. Respondent
determined that the entire underpayment for 1982 was
attributable to negligence.
The issues for decision are: (1) Do petitioners have gross income for 1982 as a result of the receipt by petitioner Robert Johnston of an interest in a partnership known as Maple Village Associates? We hold that they *135 do. (2) Are petitioners liable for 1982 for the additions to tax for negligence under section 6653(a)(1) and (2)? We hold that they are. (3) Are petitioners liable for 1982 for the addition to tax for a substantial understatement under section 6661(a)? We hold that they are. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time the petition was filed, petitioners resided in Birmingham, Michigan. Petitioners filed a joint Federal income tax return for 1982. During 1982, petitioner Robert Johnston (Mr. Johnston) owned Fiduciary Planning, Inc., a broker/dealer in securities that was registered with the State of Michigan. Sometime in the summer of 1982, Jay Landesman (Mr. Landesman), a 50-percent owner of Eccelston Properties, Ltd. (Eccelston), a sponsor of real estate limited partnerships, approached Mr. Johnston to ascertain whether he would be interested in participating in the organization of a real estate limited partnership that was to acquire, own, and operate Maple Village shopping center (Maple Village property or shopping center) in the Detroit area and that was to be known as Maple Village Associates (Maple Village partnership or Partnership). *136 Mr. Landesman contacted Mr. Johnston because Mr. Johnston's broker/dealer business was based in the Detroit area and he had previously sold securities for Eccelston. Mr. Johnston agreed to participate in the formation of the Partnership and to serve as its general partner. Eccelston insisted that an individual, and not a corporation, serve as the general partner of Maple Village partnership because of advice received from its tax adviser that an individual general partner was necessary to ensure that it would be treated as a partnership for Federal tax purposes. On or about September 2, 1982, Maple Village partnership was formed under the laws of Michigan as a limited partnership. Its initial capital was $ 100, $ 90 of which was paid by Mr. Johnston in return for a 90-percent interest as a general partner and $ 10 of which was paid by another individual (original limited partner) in return for a 10-percent interest as a limited partner. The original limited partner was to withdraw as a limited partner from the Partnership and receive a return of his $ 10 capital contribution upon the admission as limited partners in Maple Village partnership of those investors who agreed to *137 purchase the limited partnership interests that were to be offered for sale. Subsequent to the formation of Maple Village partnership, 40 units of limited partnership interests were offered for sale at $ 200,000 per unit. Each such unit entitled the investor to a 2.475-percent limited partnership interest in Maple Village partnership. Pursuant to Federal securities laws, an offering document entitled "Confidential Private Placement Memorandum, Maple Village Associates" (placement memorandum) was prepared by Eccelston for distribution to potential purchasers of the limited partnership interests. According to that placement memorandum, the $ 200,000 purchase price for each unit of such interests was payable as follows: $ 11,750 payable upon subscription by the investor; $ 150,600 in 16 installments of $ 9,412.50 each, payable on January 31, April 30, July 31, and October 31 of each of the years 1983 through 1986; and $ 37,650 in three installments of $ 12,550 each, payable on January 31, April 30, and July 31 of 1987. Each limited partner was required to execute noninterest-bearing, negotiable promissory notes that evidenced each of those installment obligations. (The notes executed *138 by the limited partners of Maple Village partnership will be referred to herein as negotiable installment notes.) The placement memorandum further provided that Mr. Johnston was to serve as the general partner of Maple Village partnership. It also stated in part: The General Partner will make no contribution to the capital of the Partnership but will own one (1%) percent of the capital, profits and losses of the Partnership. * * * * * * The General Partner will receive a 1% interest in the profits, losses and distributions of the Partnership. This compensation will be received despite no capital contribution by him. He will also receive a one-time organization [sic] fee of $ 30,000.
The amended limited partnership agreement for Maple Village partnership (amended partnership agreement) that was attached to the placement memorandum also provided that the general partner was entitled to one percent of the profits, losses, and distributions of Maple Village partnership, including any liquidating distribution. The placement memorandum set forth certain organizational services for which Mr. Johnston, as general partner, was responsible. For example, Mr. Johnston had sole *139 authority to extend the deadlines for selling the limited partnership interests and for closing the purchase of the Maple Village property from September 30, 1982, until December 31, 1982. He also had the discretion to allow a person to buy only a partial unit of a limited partnership interest. In addition, Mr. Johnston, along with a person identified as the placement agent, [2] was responsible for judging whether investors interested in purchasing limited partnership interests were qualified economically to bear the risk of investing in Maple Village partnership. The placement memorandum further indicated that "Robert Johnston, the General Partner, will manage and control the affairs of the Partnership." The amended partnership agreement for Maple Village partnership also stated: The General Partner shall have the exclusive *140 right to manage the business of the Partnership with all rights and powers generally conferred by law or necessary, advisable or consistent in connection therewith, and shall devote to the Partnership such time as may be necessary for the property performance of his duties under this Agreement.
The amended partnership agreement granted Mr. Johnston, as the general partner of Maple Village partnership, the following specific rights, powers, and duties to: (1) arrange the sale of a defaulting limited partner's interest; (2) borrow money for the Partnership, including mortgaging or otherwise pledging the assets; (3) pledge, hypothecate, assign, discount, grant a security interest in, or otherwise deal with the negotiable installment notes of the limited partners; (4) enter into contracts of insurance; (5) employ agents, attorneys, brokers, etc., on behalf of the Partnership; (6) maintain the Maple Village property in operating condition; (7) bring, defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust a claim of or against the Partnership; (8) establish a reserve fund; (9) consent, modify, renew, or extend any contract or obligation of the Partnership; *141 (10) give written consent to a limited partner wishing to transfer his or her interest in Maple Village partnership; and (11) record accurately each transaction of the Partnership and keep full and accurate books of the Partnership. Each limited partner appointed the general partner, Mr. Johnston, in the amended partnership agreement as attorney-in-fact to execute, acknowledge, deliver, swear to, file, and record at the appropriate public office such documents as may be necessary or appropriate to carry out the provisions of the amended partnership agreement. From 1982 and thereafter, Mr. Johnston, as general partner, signed Maple Village partnership's Federal tax returns. Those returns were prepared by Eccelston, which maintained the books and records of the Partnership. The placement memorandum specifically stated that it was expected that Mr. Johnston would devote only minimal time to the affairs of Maple Village partnership. Eccelston was responsible for negotiating the purchase of the Maple Village property on behalf of Maple Village partnership. The closing by the Partnership of the purchase of that shopping center was never assured prior to the actual closing that took *142 place sometime in late December 1982. [3] Prior to that closing, and subsequent to the formation of Maple Village partnership for State law purposes in September 1982, all 40 units of the limited partnership interests had been sold to investors. Mr. Johnston sold at least some of those interests to investors on behalf of Eccelston for which he was paid commission income. All of the contributions made by the investors to Maple Village partnership in return for their limited partnership interests therein were held in escrow pending the closing of the purchase of the Maple Village property. Prior to that closing in late December 1982, the Partnership had no control over those escrowed amounts, and those contributions to the Partnership remained contingent upon whether it in fact closed the purchase of the shopping center. The investors did not receive their limited partnership interests in, and were not admitted as limited partners of, Maple Village *143 partnership until that closing in late December 1982. The Partnership purchased the Maple Village property by paying $ 600,000 at the time of the closing in late December 1982 and executing a mortgage for $ 11,400,000. The total capital of the Partnership as of that closing was $ 8,000,000, consisting of $ 470,000 in cash and $ 7,530,000 in negotiable installment notes that were payable quarterly during each year over a five-year period. Because the limited partners had not contributed enough cash as of the time of the closing to cover the downpayment on the Maple Village property and other organizational expenses, some of the negotiable installment notes contributed by the limited partners were hypothecated through a bank willing to advance funds based on those notes. As of the time of that closing in late December 1982, some unidentified amount of those notes was expected to become uncollectible. Over the lifetime of the negotiable installment notes, the limited partners defaulted on approximately $ 500,000 of those notes. After having purchased the Maple Village property, Maple Village partnership leased it to Eccelston. Eccelston agreed to be responsible for the management *144 and maintenance of the shopping center in return for a fee from the Partnership. Mr. Johnston had no interest in Eccelston and did not assist Eccelston in carrying out its management contract for the Maple Village property. As of December 31, 1982, Mr. Johnston held a one-percent interest in the profits, losses, and capital of Maple Village partnership. Mr. Johnston received that interest in late December 1982 at the time of the closing by the Partnership of the purchase of the shopping center when each limited partner shifted part of his or her capital contribution to him as compensation for services. He also received the $ 30,000 organizational fee provided for in the placement memorandum. Mr. Johnston could neither transfer his interest in Maple Village partnership nor withdraw as its general partner without the written consent of a majority of the interests of the limited partners. The limited partners could not remove Mr. Johnston as the general partner, compel his withdrawal from the Partnership, or elect additional general partners, except on his death, bankruptcy, legal incapacity, retirement, withdrawal from Maple Village partnership, or his failure to perform the acts *145 required by the amended partnership agreement. In their 1982 income tax return, petitioners claimed a loss of $ 14,329 from Maple Village partnership. OPINION Petitioners bear the burden of proving that respondent's determinations in the notice of deficiency (notice) are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Partnership Interest
Respondent determined in the notice that the one-percent capital interest in Maple Village partnership that Mr. Johnston received in 1982 had a fair market value of $ 80,808 that is includible in petitioners' gross income upon receipt. Section 721 provides that neither a partnership nor any of its partners are to recognize gain or loss in the case of a contribution of property to a partnership in exchange for an interest in that partnership. Whether a partner contributes property, services, or some combination thereof to a partnership is a question of fact. Mark IV Pictures, Inc. v. Commissioner, 969 F.2d 669, 672 (8th Cir. 1992), affg. T.C. Memo. 1990-571; see United States v. Frazell, 335 F.2d 487, 490-491 (5th Cir. 1964). *146 The determination of the fair market value of an interest in a partnership received by a partner also is a question of fact. Mark IV Pictures, Inc. v. Commissioner, supra at 675. The burden is on that partner to prove that he or she contributed property and to establish the value of the property at the time it is contributed to the partnership. Id. at 672. To the extent that a partner relinquishes any part of his or her right to be repaid contributions of capital in favor of another partner as compensation for services such other partner provides, section 721 does not apply. [4]Sec. 1.721-1(b)(1), Income Tax Regs.; see United States v. Frazell, supra at 489. In that event, pursuant to section 1.721-1(b)(1), Income Tax Regs., the receipt of an interest in the capital [5] of a partnership is income to the partner who provides the services (service partner). That regulation further provides in part: The amount of such income is the fair market value of the interest in capital so transferred, either at the time the transfer is made for past services, or at the time the services *147 have been rendered where the transfer is conditioned on the completion of the transferee's future services. The time when such income is realized depends on all the facts and circumstance, including any substantial restrictions or conditions on the compensated partner's right to withdraw or otherwise dispose of such interest. * * *
*148 Section 1.721-1(b)(1), Income Tax Regs., specifically states that it applies regardless whether the shift of capital from a partner to a service partner occurs at the time the partnership is formed or subsequent thereto. In the present case, the parties stipulated that, as of December 31, 1982, Mr. Johnston held a one- percent interest in the profits, losses, and capital of Maple Village partnership. (Mr. Johnston's one-percent interest will sometimes be referred to herein as a one-percent capital interest.) Although it is not altogether clear, petitioners appear to argue (1) that Mr. Johnston received his interest in the Partnership in return for a capital contribution of $ 90, and not in return for services, and (2) that, in the alternative, even if he did receive his interest in return for services rather than property, he received his interest on or about September 2, 1982, so that the fair market value of such interest must be determined as of that date, and not as of late December 1982. To support their principal position, petitioners point out that (1) on or about September 2, 1982, Mr. Johnston contributed $ 90 to Maple Village partnership in return for a 90-percent *149 interest in its capital, (2) after contributions by the limited partners in late December 1982, Mr. Johnston had only a one-percent interest in the Partnership, and (3) Mr. Johnston received $ 30,000 from Maple Village partnership as compensation for services. They contend that these facts show that all that happened in December 1982 was that the 90-percent interest in Maple Village partnership that Mr. Johnston received in September 1982 in return for a contribution of $ 90 was diluted to a one-percent interest and that Mr. Johnston was adequately and completely compensated for his services when the Partnership paid him $ 30,000. Petitioners' position is without merit. Even assuming arguendo Mr. Johnston were considered for Federal tax purposes to have received an interest in Maple Village partnership in September 1982, [6] petitioners' contention that in December 1982 Mr. Johnston accepted a dilution of his interest in Maple Village partnership from 90 percent to one percent when the investors were admitted as limited partners ignores section 1.721-1(b)(1), Income Tax Regs. That regulation specifically provides that the shift in capital from one partner to a service partner can *150 occur subsequent to the formation of a partnership. To determine whether such a shift in capital *151 has occurred, we must examine the effects of a hypothetical liquidation of the partnership occurring immediately after the partners receive their partnership interests. See Mark IV Pictures, Inc. v. Commissioner, 969 F.2d at 674. If the service partner is entitled upon liquidation to a share of the capital contributed by other partners, a shift in capital has occurred, and the service partner has received an interest in the capital of the partnership for which he did not make a contribution of property. Id. at 673-674. In the instant case, as provided in the placement memorandum and as we have found, the limited partners were not admitted as limited partners to, and did not receive their interests in, Maple Village partnership until late December 1982 when the purchase of the Maple Village property was completed. When it was formed for State law purposes on or about September 2, 1982, the Partnership had minimal capitalization of $ 100, and the limited partnership interests had not even been offered for sale. [7] Between the time Maple Village partnership was formed for State law purposes in September 1982 and when *152 it closed the purchase of the shopping center in late December 1982, all 40 units of the limited partnership interests had been sold. However, prior to that closing, the limited partners' contributions were held in escrow, Maple Village partnership had no control over those escrowed amounts, and those contributions to the Partnership remained contingent upon whether it in fact closed the purchase of the Maple Village property. Thus, the limited partners did not receive their interests in Maple Village partnership until the closing of the purchase of the Maple Village property in late December 1982. Since the limited partners did not receive their interests in Maple Village partnership until the closing of the purchase *153 of the shopping center in late December 1982, that closing date is the appropriate date on which to determine whether the limited partners shifted part of their capital to Mr. Johnston in return for services. See Mark IV Pictures, Inc. v. Commissioner, supra at 674. As of that date, the investors' contributions were removed from escrow, each investor contributed to the Partnership a total of $ 200,000 in cash and negotiable installment notes ($ 11,750 in cash and $ 188,250 in negotiable installment notes) for a 2.475-percent limited partnership interest, and the limited partners shifted to Mr. Johnston, and he received, a one-percent interest in the profits, losses, and capital of the Partnership that entitled him to one percent of the assets of Maple Village partnership upon liquidation.[8] If the Partnership had been liquidated as of that time, [9] the Partnership would have had a total of $ 8,000,000 in cash and negotiable installment notes ($ 470,000 in cash and $ 7,530,000 in negotiable installment notes). Of that amount, each limited partner would have been entitled to a 2.475-percent share, i.e., a total of $ 198,000 in cash and negotiable *154 installment notes, and Mr. Johnston would have been entitled to a one-percent share, i.e., a total of $ 80,000 in cash and negotiable installment notes. Thus, each limited partner shifted $ 2,000 of his or her capital contribution to Mr. Johnston. See sec. 1.721-1(b)(1), Income Tax Regs.
*155 Contrary to petitioners' position, Mr. Johnston did not hold his one-percent capital interest in Maple Village partnership on December 31, 1982, as a result of his having made a capital contribution to that Partnership in September 1982 when he contributed $ 90 to the Partnership in return for a 90-percent interest therein. [10] The total capitalization of the Partnership immediately after it was formed under State law on or about September 2, 1982, was only $ 100. Thus, if Maple Village partnership had been liquidated after Mr. Johnston contributed $ 90 of capital to it but before the limited partners' capital contributions were released from escrow to the Partnership in late December 1982, Mr. Johnston would have been entitled to only the $ 90 he contributed to it in September 1982. In contrast, if the Partnership had been liquidated in late December 1982, after the limited partners shifted to Mr. Johnston $ 80,000 of their capital, Mr. Johnston would have been entitled to a one-percent share or $ 80,000. In this connection, it is noteworthy that the placement memorandum informed potential limited partners of Maple Village partnership that a dilution of their investment would *156 occur as a result of their giving Mr. Johnston a one-percent interest in the capital of the Partnership without his making a capital contribution. Petitioners appear to contend that even if the Court were to hold that in late December 1982 the limited partners did shift to Mr. Johnston, and he did receive, a one-percent capital interest in the Partnership, such interest was not transferred to him as compensation for services. They assert that the $ 30,000 organizational fee that Mr. Johnston received pursuant to the placement memorandum represented full compensation for any services he provided to Maple Village partnership. Mr. Johnston testified that the $ 30,000 fee was to compensate him for assuming as general partner unlimited liability for the debts of the Partnership. His testimony does not establish that the $ 30,000 fee was intended to be his total compensation for services to the Partnership. Indeed, the placement *157 memorandum makes it clear that the reason the limited partners shifted to Mr. Johnston part of their capital interest in Maple Village partnership was to compensate him and that he was to receive that capital interest in addition to the $ 30,000 organizational fee. That document states in part: The General Partner will make no contribution to the capital of the Partnership but will own one (1%) percent of the capital, profits and losses of the Partnership. * * * * * * The General Partner will receive a 1% interest in the profits, losses and distributions of the Partnership. This compensation will be received despite no capital contribution by him. He will also receive a one-time organization [sic] fee of $ 30,000.
As Mr. Johnston admitted at trial, the word "compensation" as used in the private placement memorandum when referring to his receipt of a one-percent capital interest in the Partnership means compensation in the ordinary sense. Despite petitioners' protestations about the placement memorandum not meaning what it says, we find that the placement memorandum, which was used as a disclosure document for potential investors in Maple Village partnership, meant exactly *158 what it said: the one-percent capital interest to which Mr. Johnston was entitled was compensation. Petitioners have not explained why else the limited partners were willing to transfer part of their capital in the Partnership to Mr. Johnston. In addition to the express terms of the placement memorandum quoted and discussed above that establish that Mr. Johnston received his one-percent capital interest in Maple Village partnership as compensation, the record establishes that Mr. Johnston agreed to, and did, perform certain services for Maple Village partnership. First and foremost, he agreed to, and did, serve as the general partner of the Partnership. His serving as general partner was critical, and therefore valuable, as far as Eccelston was concerned, since Eccelston's tax advisers were of the opinion that an individual, and not a corporation, was needed to serve as the general partner of the Partnership in order to ensure its qualification as a partnership for Federal tax purposes. Mr. Johnston also was responsible as general partner for performing various services set forth in the placement memorandum and the amended partnership agreement attached thereto. Some of those *159 services were organizational in nature to be performed prior to, or at the time of, the closing by Maple Village partnership of the purchase of the Maple Village property. [11] *160 To illustrate, Mr. Johnston had sole authority to, and apparently did, [12] extend the offering period from September 30, 1982, until December 31, 1982, within which to sell limited partnership interests to potential investors. Mr. Johnston was also obligated to perform certain services as general partner subsequent to the closing of the purchase of the Maple Village property. For example, as general partner, Mr. Johnston was responsible for the management of the affairs of Maple Village partnership and for maintaining the books and records of that Partnership. Although it was anticipated that Mr. Johnston would devote only minimal time to the affairs of the Partnership, this in no way changes the fact that he was expected to, and did, perform some services for it. Based on our review of the entire record in this case, we find that the limited partners shifted to Mr. Johnston in late December 1982 a one-percent capital interest in Maple Village partnership as compensation for services. We shall now determine the income tax consequences to petitioners from our finding. To determine those consequences, we must decide when the fair market value of that interest is to be determined and what the fair market value of that interest was on that valuation date. Petitioners appear to argue, in the alternative, that if the Court were to find that the limited partners shifted to Mr. Johnston a capital interest in Maple Village partnership as compensation for services, in determining the amount includible in their income for 1982, [13] it should use September 1982, when Mr. Johnston contributed $ 90 to form Maple Village partnership, as the time at which to determine the fair market value of that interest. We disagree. Petitioners' alternative *161 argument, as was true of their principal argument, ignores section 1.721 -1(b)(1), Income Tax Regs., and the record in this case. *162 Under section 1.721-1(b)(1), Income Tax Regs., the amount of income that petitioners must recognize is the fair market value of the interest transferred to Mr. Johnston, either at the time the transfer is made for his past services or at the time the services are performed if the transfer is conditioned on the completion of future services by Mr. Johnston. For the reasons discussed above, we have found that the limited partners did not shift part of their capital interest in the Partnership to Mr. Johnston, and that he did not receive such an interest, until the time in late December 1982 at which the Partnership closed the purchase of the Maple Village property. Thus, contrary to petitioners' alternative position, September 1982 is not the time at which a one-percent capital interest was transferred to Mr. Johnston by the limited partners. Consequently, under section 1.721-1(b)(1), Income Tax Regs., September 1982 is not the time at which the fair market value of that interest should be determined. We turn now to whether the transfer by the limited partners to Mr. Johnston in late December 1982 of a one-percent capital interest in the Partnership was conditioned on the completion *163 of future services by him. If we find that it was, section 1.721- 1(b)(1), Income Tax Regs., requires that the fair market value of that interest be determined at the time such services are rendered by Mr. Johnston. Although Mr. Johnston was obligated to perform some minimal future services after the limited partners transferred to him in late December 1982 a one-percent capital interest in the Partnership, [14] petitioners do not argue, and we find that the record does not establish, that the transfer of that interest was conditioned on the performance of future services by him. Consequently, the rule in section 1.721- 1(b)(1), Income Tax Regs., prescribing the time at which a determination must be made of the fair market value of a capital interest that is transferred to a service partner and that is conditioned on the completion of future services by that service partner, does not apply to the facts presented here. *164 On the instant record, we find that the fair market value of the one-percent capital interest in the Partnership that was shifted to Mr. Johnston and that is includible in petitioners' income for 1982 must be determined as of the time in late December 1982 at which the limited partners transferred that interest to him. [15]
*165 Respondent determined in the notice that when the limited partners transferred to Mr. Johnston a one-percent capital interest in the Partnership its fair market value was $ 80,808. [16] In determining that value, respondent reasoned that since each limited partner was willing to purchase a 2.475-percent interest in the capital of Maple Village partnership for $ 200,000, a willing buyer would pay $ 80,808 for a one-percent capital interest in that Partnership (1%/2.475% x $ 200,000). Petitioners appear to contend that respondent's determination of *166 the fair market value of the interest received by Mr. Johnston is erroneous. [17] They assert that respondent's valuation ignores the fact that Mr. Johnston was a general partner, and not a limited partner. They appear to argue that a willing buyer would not pay the same amount for an interest as a general partner exposed to unlimited liability that he or she would pay for an interest as a limited partner not exposed to unlimited liability. They also appear to contend that respondent failed to take into account that some amount of the negotiable installment notes were expected to, and that about $ 500,000 of those notes did in fact, become uncollectible over the life of Maple Village partnership. Although petitioners' arguments may have some theoretical appeal, petitioners failed to offer any evidence, and we have found none in the record, that would provide us with an informed, *167 reasoned basis on which to find that the fair market value of the one-percent capital interest transferred to Mr. Johnston by the limited partners in late December 1982 is an amount different from the value determined by respondent. [18] Accordingly, based on the instant record, we sustain the fair market value determined by respondent. *168 Based on our review of the entire record in this case, we sustain respondent's determination that petitioners must include in their gross income for 1982 the fair market value, as determined by her, of the one-percent capital interest in Maple Village partnership that the limited partners transferred to Mr. Johnston in late December of that year. [19]
Additions to Tax -- Negligence
Respondent determined that petitioners are liable for 1982 for the additions to tax for negligence under section 6653(a)(1) and (2). Section 6653(a)(1) imposes an addition to tax equal to five percent of the entire underpayment of tax if any part of the underpayment for the year is attributable to negligence or intentional disregard of rules and regulations. Section 6653(a)(2) imposes an addition to tax equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. Negligence has been defined as *169 a lack of due care or failure to do what a reasonable person would do under the circumstances. Leuhsler v. Commissioner, 963 F.2d 907, 910 (6th Cir. 1992), affg. T.C. Memo. 1991-179; Antonides v. Commissioner, 91 T.C. 686, 699 (1988), affd. 893 F.2d 656 (4th Cir. 1990); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners assert that they were not negligent in failing to include the fair market value of the capital interest in Maple Village partnership that Mr. Johnston received during 1982 in their income for that year because the law was sufficiently unsettled so as to allow a reasonable person to believe that Mr. Johnston did not receive an interest in a partnership that they were required to report as income. [20] As examples of the unsettled state of the law, petitioners point to Diamond v. Commissioner, 56 T.C. 530 (1971), affd. 492 F.2d 286 (7th Cir. 1974), and Campbell v. Commissioner, 943 F.2d 815 (8th Cir. 1991), affg. in part, revg. *170 in part T.C. Memo. 1990-162. Both of those cases deal with whether a taxpayer who receives an interest in only the profits of a partnership, as distinguished from an interest in the capital of a partnership, has income as a result of the receipt of such a profits interest.
Mr. Johnston received not only a profits interest, but also a *171 capital interest, in Maple Village partnership. Consistent with the placement memorandum, the parties stipulated that, as of December 31, 1982, Mr. Johnston held a one-percent interest in the capital, profits, and losses of Maple Village partnership. Thus, it cannot be claimed that Mr. Johnston received only a profits interest in Maple Village partnership. Consequently, neither Diamond v. Commissioner, supra, nor Campbell v. Commissioner, supra, is applicable to petitioners' situation. Petitioners presented no authority on which a reasonable person would have relied to support their position that the transfer to Mr. Johnston of an interest in the capital of Maple Village partnership for which he did not make a contribution of property is excludible from gross income. In fact, they ignored the pertinent authority, section 1.721-1(b)(1), Income Tax Regs., of which a reasonable person should have been aware and on which such a person should have relied. That regulation expressly provides that the receipt of an interest in the capital of a partnership as a result of a partner's shifting his or her capital contribution *172 to another partner in return for services is includible in the gross income of the partner receiving that capital interest. Based on the entire record, we find that petitioners failed to prove that they were not negligent in failing to include in their income for 1982 the fair market value of the one-percent capital interest in Maple Village partnership transferred to Mr. Johnston by the limited partners in late December of that year. Consequently, we sustain respondent's determination that petitioners are liable for 1982 for the additions to tax for negligence under section 6653(a)(1) and (2). Additions to Tax -- Substantial Understatement of Income Tax
Respondent determined that petitioners are liable for 1982 for the addition to tax for a substantial understatement of income tax under section 6661(a). Section 6661(a) imposes an addition to tax equal to 10 percent of the amount of any such understatement. The amount of the understatement is equal to the amount of tax required to be shown on the return less the amount of tax shown on the return. Sec. 6661(b)(2)(A). The amount of the understatement is reduced by the portion of the understatement that is attributable *173 to an item for which there is or was substantial authority for the position taken in the return or which was adequately disclosed in the return. [21] Sec. 6661(b)(2)(B). For the reasons discussed above with respect to the additions to tax for negligence, and based on our review of the record in this case, we find that petitioners failed to prove that they had substantial authority for their position that Mr. Johnston did not receive an interest in Maple Village partnership during 1982 that was gross income to them for that year. Consequently, we sustain respondent's determination that petitioners are liable for 1982 for the addition to tax for a substantial understatement under section 6661(a). *174 To reflect the foregoing, Decision will be entered for respondent. Footnotes
1. All section references are to the Internal Revenue Code in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The placement memorandum does not clearly define who the placement agent was. However, it appears that the placement agent was either Eccelston or some other company related to Eccelston.↩
3. The exact date of that closing is not disclosed in the record.↩
4. Nor does sec. 721 apply if such relinquishment in favor of another partner is in satisfaction of an obligation of such other partner. Sec. 1.721-1(b)(1), Income Tax Regs.↩
5. A capital interest is to be distinguished from a profits interest. A capital interest is an interest that includes the right to share in the capital of a partnership upon liquidation. A profits interest is a right to share in the profits and losses of a partnership, but not to share in its capital. See Campbell v. Commissioner, 943 F.2d 815, 822 (8th Cir. 1991), affg. in part, revg. in part T.C. Memo. 1990-162↩. Although a capital interest may include a right to share in the profits and losses of a partnership, a profits interest does not include the right to share in the capital of a partnership.
6. A partnership does not come into existence for Federal tax purposes until "the parties thereto have a good-faith intent to presently conduct an enterprise with a business purpose." Torres v. Commissioner, 88 T.C. 702, 736 (1987); see Commissioner v. Culbertson, 337 U.S. 733, 742 (1949). The sole purpose for which Maple Village partnership was organized was to own and operate the Maple Village property. Prior to the time of the closing of the purchase of the Maple Village property in Dec. 1982, the Partnership could not have had, and did not have, a bona fide "intent to presently conduct an enterprise with a business purpose." Torres v. Commissioner, supra↩ at 736. Accordingly, on the instant record, we find that Maple Village partnership did not exist as a partnership for Federal tax purposes prior to Dec. 1982.
7. Moreover, according to the placement memorandum, the original limited partner, who contributed $ 10, was scheduled to withdraw from Maple Village partnership at the closing by the Partnership of the purchase of the Maple Village property in Dec. 1982 when the investors were admitted as limited partners.↩
8. The placement memorandum, to which is attached the amended partnership agreement for Maple Village partnership, provides that, in the event of liquidation of the Partnership and after all liabilities are paid, Mr. Johnston is to receive one percent of all remaining assets of the Partnership.↩
9. The closing of the purchase of the shopping center apparently occurred simultaneously with the release of the investors' contributions from escrow, each investor's contribution of $ 200,000 in cash and negotiable installment notes to the Partnership in return for a 2.475 -percent limited partnership interest, and the limited partners' transfer, and Mr. Johnston's receipt, of a one-percent capital interest in the Partnership. Our Opinion assumes that the contributions of the limited partners were held by the Partnership for an instant prior to its closing the purchase of the Maple Village property and that the hypothetical liquidation of the Partnership occurred at that instant. However, even if the Partnership were assumed to have been liquidated immediately after all of the various simultaneous events occurred, the Partnership presumably would have been able to sell the Maple Village property for the same amount it paid to purchase it. Thus, the amount of capital invested in the Partnership should not be affected by the ordering of those events.↩
10. It is unclear from the record what happened to the $ 90 contributed by Mr. Johnston.↩
11. It may well be that the $ 30,000 organizational fee was paid to Mr. Johnston for his performing these types of organizational services, but the record is not clear on this point.↩
12. We draw this inference because the closing of the purchase of the Maple Village property did not occur until late Dec. 1982.↩
13. Mr. Johnston testified, consistent with the placement memorandum and the amended partnership agreement, that his interest as general partner was not transferable without the consent of a majority of the interests of the limited partners. Petitioners do not argue from this fact or any other facts in the record that if the Court were to find that Mr. Johnston received an interest in the capital of Maple Village partnership in return for services, such interest should not be included in their income for 1982, but should be so included for a year subsequent to that year. Rather, they appear to argue that, in that event, such interest should be valued as of Sept. 1982, and not Dec. 1982. Since petitioners do not argue that the value of the capital interest transferred to Mr. Johnston, if includible in their income, should be included in their income for a year subsequent to 1982, we consider them to have conceded that such interest, if includible in their income, must be so included for 1982.↩
14. The placement memorandum specifically stated that Mr. Johnston was expected to devote only minimal time to the affairs of Maple Village partnership. Pursuant to a contract between the Partnership and Eccelston, Eccelston was responsible for the management and maintenance of the Maple Village property and for maintaining the Partnership's books and records.↩
15. We recognize that sec. 1.721-1(b)(1), Income Tax Regs., does not specifically address the time at which the capital interest shifted to Mr. Johnston as compensation for services should be valued. That regulation prescribes the time for valuing a capital interest in a partnership that is transferred by a partner to a service partner as compensation (1) when such an interest is received for past services or (2) when such an interest is conditioned on the performance of future services. It does not specifically address the time for valuing such an interest where, as is the case here, that interest is received as compensation for some past, as well as for some minimal future, services, but is not conditioned on the performance of those future services. Nonetheless, where a service partner is not subject to forfeiting his or her capital interest in a partnership for failing to perform future services, we believe that service partner is in essentially the same position as the service partner who is described in sec. 1.721-1(b)(1), Income Tax Regs., and to whom a capital interest is transferred by other partners as compensation solely for past services. Such service partner should therefore be required to value his or her capital interest at the time it is transferred to such service partner by the other partners. We also note that although neither party argues the applicability of sec. 83, our holding that Mr. Johnston must determine the fair market value of the capital interest transferred to him by the Partnership's limited partners as of the date of the transfer is the same result that we would reach if sec. 83 were applicable to the present case. Since the transfer in late Dec. 1982 to Mr. Johnston by the limited partners of a one-percent capital interest in Maple Village partnership was not conditioned on the performance of substantial future services by him, his interest was not subject to a substantial risk of forfeiture. See sec. 83(a); sec. 1.83-3(c)(1), Income Tax Regs.↩ Therefore, sec. 83, if applicable here, would require valuation of the capital interest transferred to Mr. Johnston, and inclusion of that value in petitioners' income, as of the time it was transferred to him in late Dec. 1982.
16. The fair market value of that interest is not necessarily the same as the amount of capital to which Mr. Johnston could have been entitled if Maple Village partnership had been liquidated immediately after the limited partners shifted that interest to him. This is because of factors that might exist which could affect fair market value, such as anticipated gains and/or losses of the Partnership and material restrictions on transferability of the Partnership interests.↩
17. We addressed and rejected above petitioners' position that Mr. Johnston's one-percent capital interest should be valued as of Sept. 1982.↩
18. We are aware that, in Campbell v. Commissioner, 943 F.2d at 823, the United States Court of Appeals for the Eighth Circuit stated that this Court relied too heavily on the value of a separate class of partnership interests when valuing the partnership interest at issue in that case. However, unlike that case, in which the taxpayers received only a profits interest, Mr. Johnston received an interest that entitled him to share with the limited partners in not only the profits and losses, but also the capital, of Maple Village partnership. We also note that, unlike the taxpayers in Campbell, petitioners presented no evidence, such as the testimony of an expert witness, to show that there is any "difference in the nature of the investments" or that the value of the limited partnership interests in Maple Village partnership is an inaccurate measure of the value of the capital interest transferred to Mr. Johnston by the limited partners. See id.↩
19. We have considered all of petitioners' other arguments and find them to be without merit.↩
20. On brief, petitioners assert that they failed to include in their income for 1982 the value of the capital interest shifted to Mr. Johnston by the limited partners based on consultations with accountants and legal counsel. Petitioners presented no evidence showing that such consultations actually took place or that they relied on such consultations in preparing their tax return for 1982. Consequently, we find that petitioners failed to show that they reasonably relied on the advice of professionals in not including in their income for 1982 the value of the capital interest shifted to Mr. Johnston by the limited partners in late December of that year.↩
21. Petitioners do not argue that they adequately disclosed in their 1982 return that Mr. Johnston received from the limited partners a capital interest in Maple Village partnership during 1982. Consequently, we consider them to have conceded that they did not adequately disclose the receipt of that interest in their 1982 return.↩